# EXHIBIT A
## (Part 1 of 2)

DEFA14A 1 d310843ddefa14a.htm DEFA14A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 25, 2022**

---

# Twitter, Inc.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-36164** | **20-8913779** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1355 Market Street, Suite 900**
**San Francisco, California 94103**
**(Address of principal executive offices, including zip code)**

**(415) 222-9670**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---|:---:|:---:|
| **Common Stock, par value $0.000005 per share** | **TWTR** | **New York Stock Exchange** |
| **Preferred Stock Purchase Rights** | **N/A** | **New York Stock Exchange** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01. Entry into a Material Definitive Agreement.**

**Merger Agreement**

On April 25, 2022, Twitter, Inc. ("Twitter") entered into an Agreement and Plan of Merger (the "Merger Agreement") with X Holdings I, Inc. ("Parent"), X Holdings II, Inc., a wholly owned subsidiary of Parent ("Acquisition Sub"), and, solely for the purpose of certain provisions of the Merger Agreement, Elon R. Musk. The Merger Agreement provides that, subject to the terms and conditions set forth in the Merger Agreement, Acquisition Sub will merge with and into Twitter (the "Merger"), with Twitter surviving the Merger and becoming a wholly owned subsidiary of Parent (the "Surviving Corporation"). Parent is wholly owned by Mr. Musk.

Twitter's Board of Directors (the "Board") unanimously determined that the transactions contemplated by the Merger Agreement, including the Merger, are in the best interests of Twitter and its stockholders, and approved the Merger Agreement and the transactions contemplated by the Merger Agreement. The Board also unanimously resolved to recommend that Twitter's stockholders vote to adopt and approve the Merger Agreement and the Merger.

Under the Merger Agreement, at the effective time of the Merger, each issued and outstanding share of Twitter's common stock (subject to certain exceptions set forth in the Merger Agreement) will be canceled and converted into the right to receive $54.20 in cash, without interest (the "Merger Consideration").

At the effective time of the Merger, Twitter's equity-based awards (other than stock options) generally will be treated in the following manner:

- Each outstanding equity-based award, to the extent then vested, will be canceled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (1) the amount of the Merger Consideration by (2) the total number of shares of Twitter's common stock then subject to the then-vested portion of such equity-based award (and with respect to any vested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the level of performance at which such equity-based award vested in accordance with its terms).

- Each outstanding equity-based award, to the extent not then vested, will be canceled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (1) the amount of the Merger Consideration by (2) the total number of shares of Twitter's common stock subject to the then-unvested portion of such equity-based award (and with respect to any unvested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the target level of performance). Such cash amount will, subject to the holder's continued service with Parent and its affiliates (including Twitter) through the applicable vesting dates, vest and be payable in accordance with the existing vesting schedule and other terms and conditions of such equity-based award (other than performance-based vesting conditions).

At the effective time of the Merger, Twitter's stock options will be treated in the following manner:

- Each outstanding stock option, to the extent then vested, will be canceled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (1) the excess, if any, of the amount of the Merger Consideration over the exercise price per share of Twitter's common stock underlying such stock option by (2) the total number of shares of Twitter's common stock subject to such stock option.

- Each outstanding stock option, to the extent not then vested, will be canceled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (1) the excess, if any, of the amount of the Merger Consideration over the exercise price per share of Twitter's common stock underlying such stock option by (2) the total number of shares of Twitter's common stock subject to the then-unvested portion of such stock option. Such cash amount will, subject to the holder's continued service with Parent and its affiliates (including Twitter) through the applicable vesting dates, vest and be payable in accordance with the existing vesting schedule and other terms and conditions of such stock option.

- Any stock option, whether vested or unvested, for which the exercise price per share attributable to such stock option is equal to or greater than the Merger Consideration will be canceled without any cash payment being made in respect thereof.

Consummation of the Merger is subject to the satisfaction or waiver of customary closing conditions, including: (1) approval of the Merger Agreement by Twitter's stockholders; (2) the expiration or termination of the waiting period under the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and clearance under the antitrust and foreign investment laws of the United States and certain non-United States jurisdictions; and (3) the absence of any law or order by a governmental authority of the United States or certain non-United States jurisdictions that has the effect of rendering illegal or prohibiting consummation of the Merger, or causing the Merger to be rescinded following the completion thereof.

The Merger Agreement contains customary representations, warranties and covenants made by each of Twitter, Parent, Acquisition Sub and, for purposes of certain provisions, Mr. Musk, including, among others, covenants by Twitter regarding the conduct of its business prior to the closing of the Merger. Beginning on the date of the Merger Agreement, Twitter is subject to customary "no-shop" restrictions pursuant to which the Company may not, among other things: (1) solicit, initiate, knowingly encourage or knowingly facilitate any substantive discussion, offer or request that constitutes or would reasonably be expected to lead to a competing acquisition proposal; or (2) subject to certain exceptions, engage in negotiations or substantive discussions with, or furnish any material non-public information to, any person relating to a competing acquisition proposal or any inquiry or proposal that would reasonably be expected to lead to a competing acquisition proposal. In addition, Twitter has agreed that, subject to certain exceptions, the Board will not recommend that Twitter's stockholders vote against the adoption of the Merger Agreement or in favor of any competing acquisition proposal. Twitter has also agreed that it will file with the Securities and Exchange Commission (the "SEC") a proxy statement in preliminary form relating to the adoption of the Merger Agreement by Twitter's stockholders as promptly as reasonably practicable after the date of the Merger Agreement, and will convene and hold a special meeting of the Company's stockholders for the purpose of seeking the adoption of the Merger Agreement as promptly as reasonably practicable after the proxy statement in definitive form is ready to be filed, subject to the terms of the Merger Agreement.

Either Twitter or Parent may terminate the Merger Agreement if, among certain other circumstances, (1) the Merger has not been consummated on or before October 24, 2022, which date will be extended for six months if the closing conditions related to applicable antitrust and foreign investment clearances and the absence of any applicable law or order making illegal or prohibiting the Merger have not been satisfied as of such date; or (2) Twitter's stockholders fail to adopt the Merger Agreement. Twitter may terminate the Merger Agreement in certain additional limited circumstances, including to allow Twitter to enter into a definitive agreement for a competing acquisition proposal that constitutes a Superior Proposal (as defined in the Merger Agreement). Parent may terminate the Merger Agreement in certain additional limited circumstances, including prior to the adoption of the Merger Agreement by Twitter's stockholders if the Board recommends that Twitter's stockholders vote against the adoption of the Merger Agreement or in favor of any competing acquisition proposal.

Upon termination of the Merger Agreement under specified limited circumstances, Twitter will be required to pay Parent a termination fee of $1.0 billion. Specifically, this termination fee is payable by Twitter to Parent because (1) Twitter terminates the Merger Agreement to allow Twitter to enter into a definitive agreement for a competing acquisition proposal that constitutes a Superior Proposal; or (2) Parent terminates the Merger Agreement because the Board recommends that Twitter's stockholders vote against the adoption of the Merger Agreement or in favor of any competing acquisition proposal. This termination fee will also be payable by Twitter to Parent in the event that, generally, (1) a competing acquisition proposal for 50% or more of the stock or consolidated assets of Twitter has been publicly announced and not withdrawn, (2) the Merger Agreement is terminated because Twitter's stockholders fail to adopt the Merger Agreement or because Twitter materially breaches the Merger Agreement, and (3) within twelve months of such termination of the Merger Agreement, Twitter enters into a definitive agreement providing for a competing acquisition proposal for 50% or more of the stock or consolidated assets of Twitter and such acquisition is subsequently consummated.

Upon termination of the Merger Agreement under other specified limited circumstances, Parent will be required to pay Twitter a termination fee of $1.0 billion. Specifically, this termination fee is payable by Parent to Twitter if the Merger Agreement is terminated by Twitter because (1) the conditions to Parent's and Acquisition Sub's obligations to consummate the Merger are satisfied and the Parent fails to consummate the Merger as required pursuant to, and in the circumstances specified in, the Merger Agreement; or (2) Parent or Acquisition Sub's breaches of its representations, warranties or covenants in a manner that would cause the related closing conditions to not be satisfied. Mr. Musk has provided Twitter with a limited guarantee in favor of Twitter (the "Limited Guarantee"). The Limited Guarantee guarantees, among other things, the payment of the termination fee payable by Parent to Twitter, subject to the conditions set forth in the Limited Guarantee.

Pursuant to an equity commitment letter dated April 25, 2022, and subject to the terms thereof, Mr. Musk committed to provide Parent, at the effective time of the Merger, with an equity contribution of up to approximately $21 billion. Pursuant to a debt commitment letter dated April 25, 2022, and subject to the terms and conditions set forth therein, the commitment parties party thereto committed to provide to Acquisition Sub, at the effective time of the Merger, debt financing of approximately $13 billion. Pursuant to a margin loan commitment letter dated April 25, 2022, and subject to the terms and conditions set forth therein, the commitment parties party thereto committed to provide to X Holdings III, LLC, a Delaware limited liability company wholly owned by Mr. Musk, at the effective time of the Merger, margin loan financing of approximately $12.5 billion, the proceeds of which will be distributed or otherwise made available to Acquisition Sub.

The Merger Agreement also provides that Twitter, on one hand, or Parent and Acquisition Sub, on the other hand, may specifically enforce the obligations under the Merger Agreement, except that Twitter may only cause Mr. Musk's equity financing commitment to be funded in circumstances where the conditions to Parent's and Acquisition Sub's obligations to consummate the Merger are satisfied and the debt and margin loan financing is funded or available. As described above, if the conditions to Parent's and Acquisition Sub's obligations to complete the Merger are satisfied and Parent fails to consummate the Merger as required pursuant to the Merger Agreement, including because the equity, debt and/or margin loan financing is not funded, Parent will be required to pay Twitter a termination fee of $1.0 billion.

The foregoing description of the Merger Agreement is qualified in its entirety by reference to the full text of the Merger Agreement, a copy of which is filed as Exhibit 2.1 and is incorporated herein by reference.

The Merger Agreement contains representations and warranties by each of Parent, Acquisition Sub and Twitter. These representations and warranties were made solely for the benefit of the parties to the Merger Agreement and:

- should not be treated as categorical statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate;

- may have been qualified in the Merger Agreement by disclosures that were made to the other party in connection with the negotiation of the Merger Agreement;

- may apply contractual standards of "materiality" that are different from "materiality" under applicable securities laws; and

- were made only as of the date of the Merger Agreement or such other date or dates as may be specified in the Merger Agreement.

### Preferred Stock Rights Agreement

On April 25, 2022, the Board approved an Amendment No. 1 (the "Amendment No. 1") to the Preferred Stock Rights Agreement by and between Twitter and Computershare Trust Company, N.A. as rights agent, dated April 15, 2022 (the "Rights Agreement"). Amendment No. 1 prevents the approval, execution, delivery or performance of the Merger Agreement, or the consummation prior to the termination of the Merger Agreement of the Merger or any of the other transactions contemplated by the Merger Agreement in accordance with its terms, from, among other things, (i) resulting in a Distribution Date (as defined by the Rights Agreement) or permitting the Rights (as defined by the Rights Agreement) to be exercised or exchanged, and (ii) causing Parent, Acquisition Sub or their respective affiliates to be deemed an Acquiring Person (as defined by the Rights Agreement) for any purpose under the Rights Agreement.

The foregoing description of Amendment No. 1 is only a summary, does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement and Amendment No. 1, copies of which are attached as Exhibit 4.1 and Exhibit 4.2, respectively, and are incorporated herein by reference.

### Item 3.03. Material Modification to Rights of Security Holders.

The information included in Item 1.01 of this Current Report on Form 8-K under the caption Preferred Stock Rights Agreement is incorporated by reference into this Item 3.03.

### Additional Information and Where to Find It

Twitter, its directors and certain executive officers are participants in the solicitation of proxies from stockholders in connection with the pending acquisition of Twitter (the "Transaction"). Twitter plans to file a proxy statement (the "Transaction Proxy Statement") with the SEC in connection with the solicitation of proxies to approve the Transaction. Additional information regarding such participants, including their direct or indirect interests, by security holdings or otherwise, will be included in the Transaction Proxy Statement and other relevant documents to be filed with the SEC in connection with the Transaction. Information relating to the foregoing can also be found in Twitter's definitive proxy statement for its 2022 Annual Meeting of Stockholders (the "2022 Proxy Statement"), which was filed with the SEC on April 12, 2022. To the extent that holdings of Twitter's securities have changed since the amounts printed in the 2022 Proxy Statement, such changes have been or will be reflected on Statements of Change in Ownership on Form 4 filed with the SEC.

Promptly after filing the definitive Transaction Proxy Statement with the SEC, Twitter will mail the definitive Transaction Proxy Statement and a WHITE proxy card to each stockholder entitled to vote at the special meeting to consider the Transaction. STOCKHOLDERS ARE URGED TO READ THE TRANSACTION PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT TWITTER WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Stockholders may obtain, free of charge, the preliminary and definitive versions of the Transaction Proxy Statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Transaction at the SEC's website (http://www.sec.gov). Copies of Twitter's definitive Transaction Proxy Statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Transaction will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated April 25, 2022, by and among Twitter, Inc., X Holdings I, Inc., X Holdings II, Inc., and, solely for the purposes of certain sections, Elon R. Musk.* |
| 4.1(i) | Preferred Stock Rights Agreement, dated as of April 15, 2022, by and between Twitter, Inc. and Computershare Trust Company, N.A., as rights agent. |
| 4.2 | Amendment No. 1 to Preferred Stock Rights Agreement, dated as of April 25, 2022, by and between Twitter, Inc. and Computershare Trust Company, N.A., as rights agent. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL). |

*   Schedules and exhibits omitted pursuant to Item 601(b)(2) of Regulation S-K. Twitter will furnish supplementally a copy of any omitted schedule or exhibit to the SEC upon request. Twitter may request confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended, for any schedules or exhibits so furnished.

(i) Previously filed as Exhibit 4.1 to Twitter's Current Report on Form 8-K filed on April 18, 2022.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**TWITTER, INC.**

By:  /s/ Ned Segal
      Ned Segal
      Chief Financial Officer

Date: April 26, 2022

**Exhibit 2.1**

**EXECUTION VERSION**

AGREEMENT AND PLAN OF MERGER

by and among

X HOLDINGS I, INC.,

X HOLDINGS II, INC.

and

TWITTER, INC.

Dated as of April 25, 2022

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS                                                                              2

ARTICLE II THE MERGER                                                                              13

    Section 2.1      The Merger                                                          13
    Section 2.2      The Closing                                                         13
    Section 2.3      Effective Time                                                      13
    Section 2.4      Certificate of Incorporation and Bylaws                             13
    Section 2.5      Board of Directors                                                  14
    Section 2.6      Officers                                                            14

ARTICLE III EFFECT OF THE MERGER ON CAPITAL STOCK                                                  14

    Section 3.1      Effect on Securities                                                14
    Section 3.2      Payment for Securities; Exchange of Certificates                    15
    Section 3.3      Lost Certificates                                                   17
    Section 3.4      Transfers; No Further Ownership Rights                              17
    Section 3.5      Dissenting Shares                                                   17
    Section 3.6      Company Equity Awards                                                18
    Section 3.7      Company ESPP                                                        20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY                                           21

    Section 4.1      Organization and Qualification; Subsidiaries                        21
    Section 4.2      Capitalization                                                      21
    Section 4.3      Authority Relative to Agreement                                     23
    Section 4.4      No Conflict; Required Filings and Consents                          23
    Section 4.5      Permits; Compliance With Laws                                       24
    Section 4.6      Company SEC Documents; Financial Statements                         25
    Section 4.7      Information Supplied                                                25
    Section 4.8      Disclosure Controls and Procedures                                  25
    Section 4.9      Absence of Certain Changes or Events                                26
    Section 4.10     No Undisclosed Liabilities                                          26
    Section 4.11     Litigation                                                          26
    Section 4.12     Employee Benefit Plans                                              26
    Section 4.13     Labor Matters                                                       28
    Section 4.14     Intellectual Property                                               28
    Section 4.15     Taxes                                                               29
    Section 4.16     Material Contracts                                                  30
    Section 4.17     RESERVED                                                            30
    Section 4.18     RESERVED                                                            30
    Section 4.19     Takeover Statutes                                                   30
    Section 4.20     Vote Required                                                       30
    Section 4.21     Brokers                                                             30
    Section 4.22     Opinions of Financial Advisors                                      31
    Section 4.23     Rights Agreement                                                    31
    Section 4.24     RESERVED                                                            31

| | | |
|---|---|---|
| Section 4.25 | No Other Representations or Warranties | 31 |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB** — 31

| | | |
|---|---|---|
| Section 5.1 | Organization and Qualification | 31 |
| Section 5.2 | Authority Relative to Agreement | 32 |
| Section 5.3 | No Conflict; Required Filings and Consents | 33 |
| Section 5.4 | Financing | 33 |
| Section 5.5 | Information Supplied | 35 |
| Section 5.6 | Brokers | 35 |
| Section 5.7 | Compliance With Laws | 36 |
| Section 5.8 | Ownership of Company | 36 |
| Section 5.9 | Solvency | 36 |
| Section 5.10 | Parent Guarantee | 36 |
| Section 5.11 | Acknowledgment of Disclaimer of Other Representations and Warranties | 37 |

**ARTICLE VI COVENANTS AND AGREEMENTS** — 37

| | | |
|---|---|---|
| Section 6.1 | Conduct of Business by the Company Pending the Merger | 37 |
| Section 6.2 | Preparation of the Proxy Statement; Company Stockholders' Meeting | 40 |
| Section 6.3 | Efforts to Close; Regulatory Filings | 41 |
| Section 6.4 | Access to Information; Confidentiality | 43 |
| Section 6.5 | Non-Solicitation; Competing Proposals | 44 |
| Section 6.6 | Directors' and Officers' Indemnification and Insurance | 48 |
| Section 6.7 | Notification of Certain Matters | 50 |
| Section 6.8 | Public Announcements | 50 |
| Section 6.9 | Employee Benefits | 51 |
| Section 6.10 | Financing | 52 |
| Section 6.11 | Financing Cooperation | 56 |
| Section 6.12 | Acquisition Sub | 59 |
| Section 6.13 | Rule 16b-3 Matters | 59 |
| Section 6.14 | Delisting of Company Common Stock | 59 |

**ARTICLE VII CONDITIONS TO THE MERGER** — 59

| | | |
|---|---|---|
| Section 7.1 | Conditions to the Obligations of Each Party | 59 |
| Section 7.2 | Conditions to the Obligations of Parent and Acquisition Sub | 60 |
| Section 7.3 | Conditions to the Obligation of the Company to Effect the Merger | 60 |

**ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER** — 61

| | | |
|---|---|---|
| Section 8.1 | Termination | 61 |
| Section 8.2 | Effect of Termination | 62 |
| Section 8.3 | Termination Fee | 63 |
| Section 8.4 | Amendment | 65 |
| Section 8.5 | Extension; Waiver | 65 |
| Section 8.6 | Expenses; Transfer Taxes | 66 |

ARTICLE IX GENERAL PROVISIONS                                                                    66

    Section 9.1       Non-Survival of Representations, Warranties and Agreements      66
    Section 9.2       Notices                                                  66
    Section 9.3       Interpretation; Certain Definitions                      68
    Section 9.4       Severability                                             69
    Section 9.5       Assignment                                               69
    Section 9.6       Entire Agreement                                         69
    Section 9.7       No Third-Party Beneficiaries                             69
    Section 9.8       Governing Law                                            69
    Section 9.9       Specific Performance                                     70
    Section 9.10     Consent to Jurisdiction                                  71
    Section 9.11     Counterparts                                             71
    Section 9.12     WAIVER OF JURY TRIAL                                     71
    Section 9.13     Debt Financing Source Related Part                       71

**Index of Defined Terms**

Acceptable Confidentiality Agreement ............................................................ Section 6.5(c)
Acquisition Sub ........................................................................................ Article I, Preamble
Acquisition Sub Board ............................................................................... Article I, Recitals
Adverse Board Recommendation Change ................................................. Section 6.5(d), Article I
Affiliate ................................................................................................................... Article I
Aggregate Merger Consideration ........................................................................... Article I
Agreement ............................................................................................ Article I, Preamble
Alternative Financing ............................................................................ Section 6.10(c), Article I
Alternative Financing Debt Commitment Letter ..................................... Section 6.10(c), Article I
Antitrust Laws ...................................................................................... Section 4.4(b), Article I
Bank Debt Commitment Letter ............................................................... Section 5.4, Article I
Bank Debt Financing ............................................................................... Section 5.4, Article I
Blue Sky Laws ..................................................................................................... Article I
Book-Entry Shares ................................................................................. Section 3.1(c), Article I
Business Day ........................................................................................................ Article I
Canceled Shares ........................................................................................... Section 3.1(b)
CCC ...................................................................................................................... Article I
Certificate of Merger ............................................................................. Section 2.3(a), Article I
Certificates ........................................................................................... Section 3.1(c), Article I
Closing ................................................................................................... Section 2.2, Article I
Closing Date ........................................................................................... Section 2.2, Article I
Code ...................................................................................................................... Article I
Company ................................................................................................ Article I, Preamble
Company ASR Confirmations ................................................................................. Article I
Company Benefit Plan ........................................................................................... Article I
Company Board ........................................................................................ Article I, Recitals
Company Board Recommendation ............................................................................ Recitals
Company Bond Hedge Documentation .................................................................... Article I
Company Bond Hedge Transactions ....................................................................... Article I
Company Bylaws .................................................................................... Section 4.1, Article I
Company Certificate of Incorporation ................................................... Section 4.1, Article I
Company Common Stock ....................................................................... Section 3.1(b), Article I
Company Disclosure Letter ..................................................................................... Article I
Company Equity Awards ......................................................................................... Article I
Company ESPP ...................................................................................................... Article I
Company Intellectual Property ............................................................... Section 4.14(a), Article I
Company Material Adverse Effect ........................................................................... Article I
Company Material Contract .................................................................... Section 4.16(a), Article I
Company Option ..................................................................................................... Article I
Company Permits ................................................................................... Section 4.5(a), Article I
Company PSU ........................................................................................................ Article I
Company Related Parties ....................................................................... Section 8.3(c), Article I
Company RSA ........................................................................................................ Article I
Company RSU ........................................................................................................ Article I
Company SEC Documents ...................................................................... Section 4.6(a), Article I

| | |
|---|---|
| Company Service Provider | Article I |
| Company Stockholder Advisory Vote | Section 4.3(a), Article I |
| Company Stockholder Approval | Section 4.20, Article I |
| Company Stockholders' Meeting | Section 6.2(c), Article I |
| Company Warrant Confirmations | Article I |
| Competing Proposal | Section 6.5(g)(i), Article I |
| Consent | Section 4.4(b), Article I |
| Continuation Period | Section 6.9(a), Article I |
| Continuing Employees | Section 6.9(a), Article I |
| Contract | Article I |
| COVID-19 | Article I |
| COVID-19 Measures | Article I |
| D&O Indemnified Parties | Section 6.6(a), Article I |
| Debt Commitment Letters | Section 5.4, Article I |
| Debt Financing | Section 5.4, Article I |
| Debt Financing Source | Article I |
| Debt Financing Source Related Party | Article I |
| DGCL | Article I, Recitals |
| Dissenting Shares | Section 3.5, Article I |
| DTC | Article I |
| Effective Time | Section 2.3(a), Article I |
| Enforceability Exceptions | Section 4.3(a), Article I |
| Equity Commitment Letter | Section 5.4, Article I |
| Equity Financing | Section 5.4 |
| Equity Investor | Preamble |
| ERISA | Article I |
| ERISA Affiliate | Article I |
| Exchange Act | Article I |
| Exchange Fund | Section 3.2(a), Article I |
| Existing 2027 Senior Notes | Article I |
| Existing 2030 Senior Notes | Article I |
| Existing Convertible Notes | Article I |
| Existing Credit Agreement | Article I |
| Existing D&O Insurance Policies | Section 6.6(c), Article I |
| Existing Senior Notes | Article I |
| Expenses | Article I |
| Final Offering Period | Section 3.7, Article I |
| Financing | Section 5.4, Article I |
| Financing Agreements | Section 6.10(a)(i), Article I |
| Financing Commitments | Section 5.4, Article I |
| Financing Sources | Article I |
| Foreign Investment Laws | Article I |
| Foreign Plan | Article I |
| Funding Obligations | Section 5.4, Article I |
| GAAP | Article I |
| Goldman Sachs | Section 4.21, Article I |

vi

| | |
|---|---|
| Governmental Authority | Article I |
| Guarantor | Recitals |
| Hazardous Materials | Article I |
| HSR Act | Article I |
| Intellectual Property Rights | Section 4.14(a), Article I |
| Intervening Event | Section 6.5(d) |
| IRS | Article I |
| J.P. Morgan | Section 4.21 |
| Knowledge | Article I |
| Law | Article I |
| Lien | Article I |
| Margin Loan Borrower | Section 5.4, Article I |
| Margin Loan Commitment Letter | Section 5.4, Article I |
| Margin Loan Financing | Section 5.4, Article I |
| Merger | Article I, Recitals |
| Merger Consideration | Section 3.1(c), Article I |
| Notice of Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Notice of Superior Proposal | Section 6.5(d), Article I |
| Order | Article I |
| Parent | Article I, Preamble |
| Parent Board | Article I, Recitals |
| Parent Disclosure Letter | Article I |
| Parent Guarantee | Recitals |
| Parent Material Adverse Effect | Article I |
| Parent Owned Shares | Section 5.8 |
| Parent Related Parties | Section 8.3(c), Article I |
| Parent Termination Fee | Article I |
| Paying Agent | Section 3.2(a), Article I |
| Paying Agent Agreement | Section 3.2(a), Article I |
| Permitted Lien | Article I |
| Person | Article I |
| Personal Information | Section 4.14 |
| Post-Closing Plans | Section 6.9(b), Article I |
| Post-Closing Welfare Plans | Section 6.9(c), Article I |
| Proxy Statement | Section 4.7, Article I |
| Representatives | Section 6.4, Article I |
| SEC | Article I |
| Secretary of State | Section 2.3(a), Article I |
| Securities Act | Article I |
| Silver Lake Investment Agreement | Article I |
| Solvent | Section 5.9, Article I |
| Specified Provisions | Article I, Preamble |
| Stockholder Rights | Article I |
| Stockholder Rights Agreement | Article I |
| Stockholder Rights Plan | Article I |
| Subsidiary | Article I |

| | |
|---|---|
| Superior Proposal | Section 6.5(g)(iii), Article I |
| Surviving Corporation | Section 2.1, Article I |
| Tax | Article I |
| Tax Returns | Article I |
| Taxes | Article I |
| Termination Date | Section 8.1(b)(i), Article I |
| Termination Fee | Article I |
| Tesla Shares | Article I |
| Third Party | Article I |
| U.S. | Article I |
| Unvested Company Option | Section 3.6(a)(ii) |
| Unvested Company PSU | Section 3.6(b)(ii) |
| Unvested Company RSU | Section 3.6(d)(ii) |
| Unvested Option Consideration | Section 3.6(a)(ii) |
| Unvested PSU Consideration | Section 3.6(b)(ii) |
| Unvested RSA Consideration | Section 3.6(c) |
| Unvested RSU Consideration | Section 3.6(d)(ii) |
| Vested Company Option | Section 3.6(a)(i) |
| Vested Company PSU | Section 3.6(b)(i) |
| Vested Company RSU | Section 3.6(d)(i) |
| Vested Option Consideration | Section 3.6(a)(i) |
| Vested PSU Consideration | Section 3.6(b)(i) |
| Vested RSU Consideration | Section 3.6(d)(i) |

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of April 25, 2022 (this "**Agreement**"), is made by and among Twitter, Inc., a Delaware corporation (the "**Company**"), X Holdings I, Inc., a Delaware corporation ("**Parent**"), X Holdings II, Inc., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("**Acquisition Sub**"), and, solely for purposes of Sections 5.4, 6.2(d), 6.3, 6.8, 6.10, 6.11, 6.12 and 9.9 (the "**Specified Provisions**"), Elon R. Musk (the "**Equity Investor**").

W I T N E S S E T H:

WHEREAS, the parties desire for Parent to acquire the Company by way of a merger (the "**Merger**") of Acquisition Sub with and into the Company pursuant to the General Corporation Law of the State of Delaware (the "**DGCL**") upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors of Acquisition Sub (the "**Acquisition Sub Board**") has determined that it is advisable to, fair to and in the best interests of Acquisition Sub and its stockholders to effect the Merger of Acquisition Sub with and into the Company pursuant to the DGCL upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Company's board of directors (the "**Company Board**") has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, recommended that the Company's stockholders adopt this Agreement and approve the transactions contemplated by this Agreement, including the Merger (the "**Company Board Recommendation**");

WHEREAS, the Acquisition Sub Board has, by resolutions duly adopted, (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Acquisition Sub and Parent, as the sole stockholder of Acquisition Sub; (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration by Parent, as the sole stockholder of Acquisition Sub and (iv) recommended that Parent, as the sole stockholder of Acquisition Sub approve the Merger, and Parent, as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger;

WHEREAS, the board of directors of Parent (the "**Parent Board**") has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and Elon Musk, as the sole stockholder of Parent;

WHEREAS, as a material inducement to, and as a condition to, the Company entering into this Agreement, concurrently with the execution of this Agreement, Elon Musk (the "**Guarantor**") has entered into a limited guarantee, dated as of the date hereof, guaranteeing certain of Parent's and Acquisition Sub's obligations under this Agreement (the "**Parent Guarantee**"); and

WHEREAS, each of Parent, Acquisition Sub and the Company desires to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and covenants and subject to the conditions herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

As used in this Agreement, the following terms shall have the respective meanings set forth or referenced below:

"**Acquisition Sub**" shall have the meaning set forth in the Preamble.

"**Acquisition Sub Board**" shall have the meaning set forth in the Recitals.

"**Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Affiliate**" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"**Aggregate Merger Consideration**" shall mean the product of (x) the number of shares of Company Common Stock issued and outstanding (other than those shares canceled or retired pursuant to Section 3.1(b)) immediately prior to the Effective Time *multiplied by* (y) the Merger Consideration.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Alternative Financing**" shall have the meaning set forth in Section 6.10(c).

"**Alternative Financing Debt Commitment Letter**" shall have the meaning set forth in Section 6.10(c).

"**Antitrust Laws**" shall have the meaning set forth in Section 4.4(b).

"**Bank Debt Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Bank Debt Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Blue Sky Laws**" shall mean state securities or "blue sky" laws.

"**Book-Entry Shares**" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which all banking institutions in San Francisco, California or New York, New York are authorized or obligated by Law or executive order to close.

"**CCC**" means the California Corporations Code.

"**Certificate of Merger**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Certificates**" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"**Closing**" shall have the meaning set forth in <u>Section 2.2</u>.

"**Closing Date**" shall have the meaning set forth in <u>Section 2.2</u>.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall have the meaning set forth in the Preamble.

"**Company ASR Confirmations**" means (i) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Morgan Stanley & Co. LLC and (ii) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Wells Fargo Bank, National Association, in each case, as amended through the date hereof.

"**Company Benefit Plan**" shall mean (i) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), and (ii) each other employment agreement, bonus, stock option, stock purchase or other equity-based, benefit, incentive compensation, profit sharing, savings, retirement (including early retirement and supplemental retirement), disability, insurance, vacation, incentive, deferred compensation, supplemental retirement (including termination indemnities and seniority payments), severance, termination, retention, change of control and other similar fringe, welfare or other employee benefit plans, benefit programs, benefit agreements, benefit contracts, benefit policies or benefit arrangements (whether or not in writing), in each case, (x) which is sponsored, maintained or contributed to for the benefit of or relating to any current or former director, officer or employee of the Company or its Subsidiaries and (y) with respect to which the Company or any of its Subsidiaries has or may have any liability.

"**Company Board**" shall have the meaning set forth in the Recitals.

3

"**Company Bond Hedge Documentation**" means (a)(i) the call option transaction confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the call option transaction confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the call option transaction confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional call option transaction confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the call option transaction confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the call option transaction confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the call option transaction confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the call option transaction confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, (viii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association, (ix) the letter agreement, dated March 1, 2021, between the Company and Bank of America, N.A., (x) the letter agreement, dated March 1, 2021, between the Company and Barclays Bank PLC, (xi) the letter agreement, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (xii) the letter agreement, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (xiii) the additional letter agreement, dated March 12, 2021, between the Company and Bank of America, N.A., (xiv) the additional letter agreement, dated March 12, 2021, between the Company and Barclays Bank PLC, (xv) the additional letter agreement, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (xvi) the additional letter agreement, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Company Bond Hedge Transactions**" means each of the call option transactions evidenced by the Company Bond Hedge Documentation.

"**Company Bylaws**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Company Certificate of Incorporation**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Company Common Stock**" shall have the meaning set forth in <u>Section 3.1(a)</u>.

"**Company Disclosure Letter**" shall mean the disclosure letter delivered by the Company to Parent simultaneously with the execution of this Agreement.

"**Company Equity Awards**" shall mean, collectively, (i) Company Options, (ii) Company PSUs, (iii) Company RSAs, and (iv) Company RSUs.

"**Company ESPP**" shall mean the Company 2013 Employee Stock Purchase Plan.

"**Company Intellectual Property**" shall have the meaning set forth in <u>Section 4.14(a)</u>.

4

"**Company Material Adverse Effect**" means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole; <u>provided</u>, <u>however</u>, that changes, events, effects or circumstances which, directly or indirectly, to the extent they relate to or result from the following shall be excluded from, and not taken into account in, the determination of Company Material Adverse Effect: (i) any condition, change, effect or circumstance generally affecting any of the industries or markets in which the Company or its Subsidiaries operate; (ii) any change in any Law or GAAP (or changes in interpretations of any Law or GAAP); (iii) general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world; (iv) any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing; (v) any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other COVID-19 Measures that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 Measures, directive, pronouncement or guideline or interpretation thereof, or any continuation of or of any of the foregoing, in the United States or any other country or region in the world; (vi) the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including (A) by reason of the identity of Elon Musk, Parent or any of their Affiliates or their respective financing sources, or any communication by Parent or any of its Affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of the Company or any of its Subsidiaries and (B) any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, the Company or any of their respective Affiliates, officers or directors, in each case, arising out of or relating to the this Agreement or the transactions contemplated by this Agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators; (vii) any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub (or any action not taken as a result of the failure of Parent to consent to any action requiring Parent's consent pursuant to <u>Section 6.1</u>); (viii) any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries (<u>provided</u> that the facts or occurrences giving rise to or contributing to such changes or failure that are not otherwise excluded from the definition of "Company Material Adverse Effect" may be taken into account in determining whether there has been a Company Material Adverse Effect); and (ix) any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

"**Company Material Contract**" shall have the meaning set forth in <u>Section 4.16(a)</u>.

"**Company Option**" shall mean each outstanding option to purchase shares of Company Common Stock granted to any employee or director of, or other Company Service Provider.

"**Company Permits**" shall have the meaning set forth in <u>Section 4.5(a)</u>.

"**Company PSU**" shall mean each performance-based restricted stock unit that vests on the basis of time and the achievement of performance metrics and was granted to any Company Service Provider.

"**Company Related Parties**" shall have the meaning set forth in <u>Section 8.3(d)</u>.

"**Company RSA**" shall mean each share of Company Common Stock granted to any Company Service Provider that remains subject to vesting, lapse or forfeiture provisions.

"**Company RSU**" shall mean each time-based restricted stock unit that vests on the basis of time and was granted to any Company Service Provider.

"**Company SEC Documents**" shall have the meaning set forth in <u>Section 4.6(a)</u>.

"**Company Service Provider**" shall mean each current or former director, employee, consultant or independent contractor of the Company or any of its Subsidiaries.

"**Company Stockholder Advisory Vote**" shall have the meaning set forth in <u>Section 4.3(a)</u>.

"**Company Stockholder Approval**" shall have the meaning set forth in <u>Section 4.20</u>.

"**Company Stockholders' Meeting**" shall have the meaning set forth in <u>Section 6.2(c)</u>.

"**Company Warrant Confirmations**" means (a)(i) the warrant confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the warrant confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the warrant confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional warrant confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional warrant confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional warrant confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the warrant confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the warrant confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the warrant confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the warrant confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional warrant confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional warrant confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional warrant confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (viii) the additional warrant confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Competing Proposal**" shall have the meaning set forth in <u>Section 6.5(g)(i)</u>.

"**Consent**" shall have the meaning set forth in <u>Section 4.4(b)</u>.

6

"**Continuation Period**" shall have the meaning set forth in Section 6.9(a).

"**Continuing Employees**" shall have the meaning set forth in Section 6.9(a).

"**Contract**" means any written contract, subcontract, lease, sublease, conditional sales contract, purchase order, sales order, task order, delivery order, license, indenture, note, bond, loan, instrument, understanding, permit, concession, franchise, commitment or other agreement.

"**COVID-19**" means SARS-Co V-2 or COVID-19 or any evolutions, variants or mutations thereof.

"**COVID-19 Measures**" means quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, directives, restrictions, guidelines, responses or recommendations of or promulgated by any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, or other reasonable actions taken in response to the foregoing or otherwise, in each case, in connection with or in response to COVID-19 and any evolutions, variants or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**D&O Indemnified Parties**" shall have the meaning set forth in Section 6.6(a).

"**Debt Commitment Letters**" shall have the meaning set forth in Section 5.4.

"**Debt Financing**" shall have the meaning set forth in Section 5.4.

"**Debt Financing Source**" shall mean (i) the commitment parties party, as of the date hereof, to the Debt Commitment Letters that have been delivered to the Company in accordance with Section 5.4, and (ii) the Persons, in their respective capacities as such, that have committed to arrange or provide or have otherwise entered into agreements (including the Debt Commitment Letters or any Financing Agreements), in each case, in connection with all or any portion of the Debt Financing or Alternative Financing in connection with the transactions contemplated hereby, and any joinder agreements, indentures or credit agreements entered into pursuant thereto, together with their Affiliates, and any of their or Affiliates' respective, direct or indirect, former, current or future stockholders, managers, members, directors, officers, employees, agents, advisors, other representatives or any successors or assignees of any of the foregoing (it being understood that Parent, Acquisition Sub and any of their respective Affiliates shall not constitute "Debt Financing Sources" for any purposes hereunder).

"**Debt Financing Source Related Party**" means any Debt Financing Source, together with their respective Affiliates and their and their respective Affiliates' former, current and future officers, directors, employees, agents and representatives and their respective successors and assigns.

"**DGCL**" shall have the meaning set forth in the Recitals.

"**Dissenting Shares**" shall have the meaning set forth in Section 3.5.

"**DTC**" shall have the meaning set forth in Section 3.2(b)(ii).

7

"**Effective Time**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Enforceability Exceptions**" shall have the meaning set forth in <u>Section 4.3(a)</u>.

"**Equity Commitment Letter**" shall have the meaning set forth in <u>Section 5.4</u>.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, for any Person, each trade or business, whether or not incorporated, that, together with such Person, would be deemed a "single employer" within the meaning set forth in Section 414 of the Code.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Exchange Fund**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Existing Credit Agreement**" shall mean that certain Revolving Credit Agreement, dated as of August 17, 2018, among the Company, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A. as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing D&O Insurance Policies**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

"**Existing 2027 Senior Notes**" shall mean the 3.875% Senior Notes due 2027 issued pursuant to that certain Indenture, dated December 9, 2019, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing 2030 Senior Notes**" shall mean the 5.000% Senior Notes due 2030 issued pursuant to that certain Indenture, dated February 25, 2022, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Convertible Notes**" shall mean the (i) 0.25% Convertible Senior Notes due 2024 issued pursuant to that certain Indenture, dated June 11, 2018, among the Company, as issuer, and U.S. Bank National Association, as trustee, (ii) 0.375% Convertible Senior Notes due 2025 issued pursuant to that certain Indenture, dated March 12, 2020, among the Company, as issuer, and U.S. Bank National Association, as trustee, and (iii) 0% Convertible Senior Notes due 2026 issued pursuant to that certain Indenture, dated March 4, 2021, among the Company, as issuer, and U.S. Bank National Association, as trustee, in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Senior Notes**" shall mean the (i) the Existing 2027 Senior Notes and (ii) the Existing 2030 Senior Notes.

"**Expenses**" shall mean all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its Affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement, the preparation, printing, filing and mailing of the Proxy Statement and all SEC and other regulatory filing fees incurred in connection with the Proxy Statement, the solicitation of stockholder approvals, any filing with, and obtaining of any necessary action or non-action, Consent or approval from any Governmental Authority pursuant to any Antitrust Laws or Foreign Investment Laws, engaging the services of the Paying Agent, any other filings with the SEC, and all other matters related to the Closing and the other transactions contemplated by this Agreement.

"**Final Offering Period**" shall have the meaning set forth in <u>Section 3.7</u>.

"**Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Financing Agreements**" shall have the meaning set forth in <u>Section 6.10(a)</u>.

"**Financing Commitments**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Financing Sources**" means the Debt Financing Sources and Elon Musk.

"**Foreign Investment Laws**" shall mean any Laws designed or intended to prohibit, restrict or regulate actions (i) by foreigners to acquire interests in or control over domestic equities, securities, entities, assets, land or interests, or (ii) to acquire interests in or control over equities, securities, entities, assets, land or interests that might harm domestic national security or public interest, other than Antitrust Laws.

"**Foreign Plan**" shall mean each Company Benefit Plan that primarily covers current or former employees, directors or individual service providers of the Company or any of its subsidiaries based outside of the U.S. and/or that is subject to any Law other than U.S., federal, state or local law (other than any plan or program that is required by statute or maintained by a Governmental Authority to which the Company or any of its subsidiaries contributes pursuant to applicable Law).

"**Funding Obligations**" shall have the meaning set forth in <u>Section 5.4</u>.

"**GAAP**" shall mean the U.S. generally accepted accounting principles.

"**Goldman Sachs**" shall have the meaning set forth in <u>Section 4.21</u>.

"**Governmental Authority**" shall mean any U.S. (federal, state or local) or foreign government, or any governmental, regulatory, judicial or administrative authority, agency or commission.

"**Hazardous Materials**" means all substances (i) defined as hazardous substances, oils, pollutants or contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or (ii) defined as hazardous substances, hazardous materials, pollutants, contaminants, toxic substances (or words of similar import) by or regulated as such under any Environmental Law.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**Intellectual Property Rights**" shall have the meaning set forth in <u>Section 4.14(a)</u>.

"**IRS**" shall mean the Internal Revenue Service.

"**Knowledge**" means the actual knowledge of the directors and officers of the relevant party, following due inquiry of their direct reports and others who would be reasonably expected to have knowledge of the subject matter in question.

"**Law**" shall mean any and all domestic (federal, state or local) or foreign laws (including common law), rules, regulations, orders, judgments or decrees promulgated by any Governmental Authority.

"**Lien**" shall mean liens, claims, mortgages, encumbrances, pledges, security interests or charges of any kind.

"**Margin Loan Borrower**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Margin Loan Commitment Letter**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Margin Loan Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Merger**" shall have the meaning set forth in the Recitals.

"**Merger Consideration**" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"**Notice of Adverse Board Recommendation Change**" shall have the meaning set forth in <u>Section 6.5(d)</u>.

"**Notice of Superior Proposal**" shall have the meaning set forth in <u>Section 6.5(d)</u>.

"**Order**" shall mean any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding by or with any Governmental Authority.

"**Parent**" shall have the meaning set forth in the Preamble.

"**Parent Board**" shall have the meaning set forth in the Recitals.

"**Parent Disclosure Letter**" shall mean the disclosure letter delivered by Parent to the Company simultaneously with the execution of this Agreement.

"**Parent Material Adverse Effect**" shall mean any change, effect or circumstance which, individually or in the aggregate, has prevented or materially delayed or materially impaired, or would reasonably be expected to prevent or materially delay or materially impair, the ability of Parent or Acquisition Sub to consummate the Merger and the other transactions contemplated by this Agreement.

10

"**Parent Related Parties**" shall have the meaning set forth in <u>Section 8.3(c)</u>.

"**Parent Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Paying Agent**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Paying Agent Agreement**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Permitted Lien**" shall mean (i) any Lien for Taxes not yet delinquent or that are being contested in good faith by any appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens securing indebtedness or liabilities that are reflected in the Company SEC Documents or incurred in the ordinary course of business since the end of the most recent fiscal year for which an Annual Report on Form 10-K has been filed by the Company with the SEC and Liens securing indebtedness or liabilities that have otherwise been disclosed to Parent in writing, (iii) such Liens or other imperfections of title, if any, that do not have a Company Material Adverse Effect, including (A) easements or claims of easements whether or not shown by the public records, boundary line disputes, overlaps, encroachments and any matters not of record which would be disclosed by an accurate survey or a personal inspection of the property, (B) rights of parties in possession, (C) any supplemental Taxes or assessments not shown by the public records and (D) title to any portion of the premises lying within the right of way or boundary of any public road or private road, (iv) Liens imposed or promulgated by Laws with respect to real property and improvements, including zoning regulations, (v) Liens disclosed on existing title reports or existing surveys, (vi) mechanics', carriers', workmen's, repairmen's and similar Liens incurred in the ordinary course of business, (vii) Liens securing acquisition financing with respect to the applicable asset, including refinancings thereof and (viii) licenses of Intellectual Property Rights.

"**Person**" shall mean an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a Governmental Authority.

"**Post-Closing Plans**" shall have the meaning set forth in <u>Section 6.9(b)</u>.

"**Post-Closing Welfare Plans**" shall have the meaning set forth in <u>Section 6.9(c)</u>.

"**Proxy Statement**" shall have the meaning set forth in <u>Section 4.7</u>.

"**Representatives**" shall have the meaning set forth in <u>Section 6.4</u>.

"**SEC**" shall mean the Securities and Exchange Commission.

"**Secretary of State**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Silver Lake Investment Agreement**" means the Investment Agreement, dated as of March 9, 2020, among Twitter, Inc. and Silver Lake Partners V DE (AIV), L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Solvent**" shall have the meaning set forth in <u>Section 5.12</u>.

"**Specified Provisions**" shall have the meaning set forth in the Preamble.

"**Stockholder Rights**" means the rights distributed to the Stockholders pursuant to Company Stockholder Rights Agreement.

"**Stockholder Rights Plan**" means the Company Stockholder Rights and the Company Stockholder Rights Agreement.

"**Stockholder Rights Agreement**" means the Preferred Stock Rights Agreement, dated as of April 15, 2022, between the Company and Computershare Trust Company, N.A., as rights agent, as amended, restated, supplemented or otherwise modified from time to time

"**Subsidiary**" of any Person shall mean any corporation, partnership, joint venture or other legal entity of which such Person (either above or through or together with any other subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"**Superior Proposal**" shall have the meaning set forth in <u>Section 6.5(g)(iii)</u>.

"**Surviving Corporation**" shall have the meaning set forth in <u>Section 2.1</u>.

"**Tax**" or "**Taxes**" shall mean all federal, state, local and foreign income, profits, franchise, gross receipts, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, license, production, value added, occupancy and other taxes of any kind whatsoever, together with all interest, penalties and additions imposed with respect thereto.

"**Tax Returns**" shall mean all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) filed or required to be filed with a Tax authority.

"**Termination Date**" shall have the meaning set forth in <u>Section 8.1(b)(i)</u>.

"**Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Tesla Shares**" means shares of common stock of Tesla, Inc., $0.001 par value.

"**Third Party**" shall mean any Person or group other than Parent, Acquisition Sub and their respective Affiliates.

"**U.S.**" means the United States of America and its territories, commonwealths and possessions.

12

## ARTICLE II

## THE MERGER

Section 2.1 The Merger. Upon the terms and subject to the conditions of this Agreement, and in accordance with the DGCL, at the Effective Time, Acquisition Sub shall be merged with and into the Company, whereupon the separate existence of Acquisition Sub shall cease, and the Company shall continue under the name "Twitter, Inc." as the surviving corporation (the "**Surviving Corporation**") and shall continue to be governed by the laws of the State of Delaware.

Section 2.2 The Closing. Subject to the provisions of Article VII, the closing of the Merger (the "**Closing**") shall take place at 9:00 a.m. (Pacific Time) on a date to be specified by the parties hereto, but no later than the second (2nd) Business Day after the satisfaction or waiver of all of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall take place virtually by the electronic exchange of documents, unless another time, date or place is agreed to in writing by the parties hereto (such date, the "**Closing Date**").

Section 2.3 Effective Time.

(a) Concurrently with the Closing, the Company, Parent and Acquisition Sub shall cause a certificate of merger with respect to the Merger (the "**Certificate of Merger**") to be executed and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") in accordance with the relevant provisions of the DGCL and any other applicable Law of the State of Delaware. The Merger shall become effective on the date and time at which the Certificate of Merger has been duly filed with the Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set forth in the Certificate of Merger in accordance with the DGCL (such date and time hereinafter referred to as the "**Effective Time**").

(b) The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, (i) the Company shall be the surviving corporation in the Merger, (ii) all the property, rights, privileges, immunities, powers, franchises and liabilities of the Company and Acquisition Sub are vested in the Surviving Corporation, (iii) the separate existence of Acquisition Sub shall cease and (iv) the Company shall continue to be governed by the laws of the State of Delaware.

Section 2.4 Certificate of Incorporation and Bylaws. The parties will take all necessary actions so that at the Effective Time, the certificate of incorporation and the bylaws of Acquisition Sub, each as in effect immediately prior to the Effective Time, will be the certificate of incorporation and the bylaws, respectively, of the Surviving Corporation (except that the titles thereof shall read "Certificate of Incorporation of Twitter, Inc." and "Bylaws of Twitter, Inc.", respectively) until, subject to Section 6.6, thereafter amended in accordance with the applicable provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation.

13

Section 2.5 Board of Directors. The board of directors of the Surviving Corporation effective as of, and immediately following, the Effective Time shall consist of the members of the Acquisition Sub Board immediately prior to the Effective Time, each to serve in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors shall have been duly elected and qualified, or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.6 Officers. From and after the Effective Time, the officers of the Company at the Effective Time shall be the officers of the Surviving Corporation, until their respective successors are duly elected or appointed and qualified in accordance with applicable Law.

## ARTICLE III

## EFFECT OF THE MERGER ON CAPITAL STOCK

Section 3.1 Effect on Securities. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Acquisition Sub or the holders of any securities of the Company or Acquisition Sub:

(a) Conversion of Acquisition Sub Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, $0.01 par value per share, of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one (1) fully paid share of common stock, $0.01 par value per share, of the Surviving Corporation and constitute the only issued or outstanding shares of capital stock of the Surviving Corporation.

(b) Cancellation of Certain Company Securities. Each share of common stock, par value $0.000005 per share, of the Company (the "**Company Common Stock**") held by the Company or any of its Subsidiaries or held, directly or indirectly, by the Equity Investor, Parent or Acquisition Sub immediately prior to the Effective Time (collectively, the "**Canceled Shares**") shall automatically be canceled and retired and shall cease to exist as issued or outstanding shares, and no consideration or payment shall be delivered in exchange therefor or in respect thereof.

(c) Conversion of Company Securities. Except as otherwise provided in this Agreement, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive $54.20 per share of Company Common Stock in cash, without interest (the "**Merger Consideration**"). Each share of Company Common Stock to be converted into the right to receive the Merger Consideration as provided in this Section 3.1(c) shall no longer be issued or outstanding and shall be automatically canceled and shall cease to exist, and the holders of certificates (the "**Certificates**") or book-entry shares ("**Book-Entry Shares**") which immediately prior to the Effective Time represented such shares of Company Common Stock shall cease to have any rights with respect to such Company Common Stock other than the right to receive, upon surrender of such Certificates or Book-Entry Shares in accordance with Section 3.2(b), the Merger Consideration, without interest thereon.

14

(d) <u>Adjustments</u>. Without limiting the other provisions of this Agreement, if at any time during the period between the date of this Agreement and the Effective Time, any change in the number of outstanding shares of Company Common Stock shall occur as a result of a reclassification, recapitalization, stock split (including a reverse stock split) or similar event, or combination or exchange of shares, or any stock dividend or stock distribution with a record date during such period (in each case, other than with respect to the initial distribution of Stockholder Rights under the Stockholder Rights Plan or such Stockholder Rights becoming exercisable as a result of Parent or any of its Affiliates or Representatives becoming an "Acquiring Person" (as defined in the Stockholder Rights Agreement)), the Merger Consideration shall be equitably adjusted to provide the same economic effect as contemplated by this Agreement prior to such event. Nothing in this <u>Section 3.1(d)</u> shall be construed to permit any party to take any action that is otherwise prohibited or restricted by any other provision of this Agreement.

<u>Section 3.2 Payment for Securities; Exchange of Certificates</u>.

(a) <u>Designation of Paying Agent; Deposit of Exchange Fund</u>. Prior to the Closing, Parent shall designate a reputable bank or trust company (the "**Paying Agent**") that is organized and doing business under the laws of the U.S., the identity and the terms of appointment of which to be reasonably acceptable to the Company, to act as Paying Agent for the payment of the Merger Consideration as provided in <u>Section 3.1(b)</u>, and shall enter into an agreement (the "**Paying Agent Agreement**") relating to the Paying Agent's responsibilities with respect thereto, in form and substance reasonably acceptable to the Company. At or prior to the Effective Time, Parent shall deposit, or cause to be deposited with the Paying Agent, cash constituting an amount equal to the Aggregate Merger Consideration (such Aggregate Merger Consideration as deposited with the Paying Agent, the "**Exchange Fund**"). In the event the Exchange Fund shall be insufficient to make the payments contemplated by <u>Section 3.1(b)</u>, Parent shall promptly deposit, or cause to be deposited, additional funds with the Paying Agent in an amount which is equal to the deficiency in the amount required to make such payments in full. Parent shall cause the Exchange Fund to be (A) held for the benefit of the holders of Company Common Stock and (B) applied promptly to make payments pursuant to <u>Section 3.1(b)</u>. The Exchange Fund shall not be used for any purpose other than to fund payments pursuant to <u>Section 3.1</u>, except as expressly provided for in this Agreement.

(b) <u>Procedures for Exchange</u>. As promptly as reasonably practicable following the Effective Time and in any event not later than two (2) Business Days thereafter, the Surviving Corporation shall cause the Paying Agent to mail to each holder of record a Certificate that immediately prior to the Effective Time represented outstanding shares of Company Common Stock (A) a letter of transmittal, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon proper delivery of the Certificates (or affidavits of loss in lieu thereof) to the Paying Agent and which shall be in the form and have such other provisions as Parent and the Company may reasonably specify and (B) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration into which the number of shares of Company Common Stock previously represented by such Certificate shall have been converted pursuant to this Agreement (which instructions shall be in the form and have such other provisions as Parent and the Company may reasonably specify). Any holder of Book-Entry Shares shall not be required to deliver a Certificate or an executed letter of transmittal to receive the Merger Consideration with respect to such Book-Entry Shares.

15

(c) <u>Timing of Exchange</u>. Upon surrender of a Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share for cancellation to the Paying Agent, together with, in the case of Certificates, a letter of transmittal duly completed and validly executed in accordance with the instructions thereto, or, in the case of Book-Entry Shares, receipt of an "agent's message" by the Paying Agent (it being understood that holders of Book-Entry Shares will be deemed to have surrendered such Book-Entry Shares upon receipt of an "agent's message" with respect to such Book-Entry Shares), and such other customary evidence of surrender as the Paying Agent may reasonably require, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor (and Parent shall cause the Paying Agent to promptly deliver in exchange therefor) the Merger Consideration for each share of Company Common Stock formerly represented by such Certificate or Book-Entry Share upon the later to occur of (i) the Effective Time or (ii) the Paying Agent's receipt of such Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share, in accordance with <u>Section 3.2(b)</u>, as applicable, and the Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share so surrendered shall be forthwith canceled. The Paying Agent Agreement shall provide that the Paying Agent shall accept such Certificates (or affidavits of loss in lieu thereof) or Book-Entry Shares upon compliance with such reasonable terms and conditions as the Paying Agent may impose to effect an orderly exchange thereof in accordance with customary exchange practices. No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable upon the surrender of the Certificates or Book-Entry Shares.

(d) <u>Termination of Exchange Fund</u>. Any portion of the Exchange Fund which remains undistributed to the holders of the Certificates or Book-Entry Shares for one (1) year after the Effective Time shall be delivered to the Surviving Corporation, upon written demand, and any such holders prior to the Merger who have not theretofore complied with this <u>Article III</u> shall thereafter look only to the Surviving Corporation as a general creditor thereof for payment of their claims for the Merger Consideration in respect thereof.

(e) <u>No Liability</u>. None of Parent, Acquisition Sub, the Company, the Surviving Corporation or the Paying Agent shall be liable to any Person in respect of any cash held in the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificates or Book-Entry Shares shall not have been surrendered immediately prior to the date on which any cash in respect of such Certificate or Book-Entry Share would otherwise escheat to or become the property of any Governmental Authority, any such cash in respect of such Certificate or Book-Entry Share shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

(f) <u>Investment of Exchange Fund</u>. The Paying Agent Agreement shall provide that the Paying Agent shall invest any cash included in the Exchange Fund as directed by Parent or, after the Effective Time, the Surviving Corporation; <u>provided</u> that (i) no such investment shall relieve Parent or the Paying Agent from making the payments required by this <u>Article III</u>, and following any losses Parent shall promptly provide additional funds to the Paying Agent for the benefit of the holders of Company Common Stock in the amount of such losses, (ii) no such investment shall have maturities that could prevent or delay payments to be made pursuant to this Agreement and (iii) all such investments shall be in short-term obligations of the U.S. with maturities of no more than thirty (30) days or guaranteed by the U.S. and backed by the full faith and credit of the U.S. Any interest or income produced by such investments will be payable to the Surviving Corporation or Parent, as directed by Parent.

16

(g) <u>Withholding</u>. Each of Parent, the Surviving Corporation and the Paying Agent shall be entitled to deduct and withhold from the Merger Consideration and any amounts otherwise payable pursuant to this Agreement to any Person such amounts as are required to be deducted and withheld with respect to the making of such payment under any applicable Law. To the extent that amounts are so deducted and withheld, such amounts (i) shall be promptly remitted by Parent, the Surviving Corporation or the Paying Agent, as applicable, to the applicable Governmental Authority, and (ii) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

<u>Section 3.3 Lost Certificates</u>. If any Certificate shall have been lost, stolen or destroyed, then upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, the Paying Agent shall issue, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration to which the holder thereof is entitled pursuant to this <u>Article III</u>.

<u>Section 3.4 Transfers; No Further Ownership Rights</u>. After the Effective Time, there shall be no registration of transfers on the stock transfer books of the Company of shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If Certificates or Book-Entry Shares are presented to the Surviving Corporation, Parent or Paying Agent for transfer following the Effective Time, they shall be canceled against delivery of the applicable Merger Consideration, as provided for in <u>Section 3.1(b)</u>, for each share of Company Common Stock formerly represented by such Certificates or Book-Entry Shares. Payment of the Merger Consideration in accordance with the terms of this <u>Article III</u>, and, if applicable, any unclaimed dividends upon the surrender of Certificates, shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Company Common Stock formerly represented by such Certificates or Book-Entry Shares.

<u>Section 3.5 Dissenting Shares</u>. Notwithstanding any other provision of this Agreement to the contrary, to the extent that holders thereof are entitled to appraisal rights under Section 262 of the DGCL or similar appraisal or dissenters' rights under any other applicable Law, shares of Company Common Stock issued and outstanding immediately prior to the Effective Time and held by a holder who has properly exercised and perfected his or her demand for appraisal or dissenters' rights under Section 262 of the DGCL or such other applicable Law (the "**Dissenting Shares**"), shall not be converted into the right to receive the Merger Consideration. At the Effective Time, the Dissenting Shares shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and each holder of Dissenting Shares shall cease to have any rights with respect thereto, but the holders of such Dissenting Shares shall be entitled to receive such consideration as shall be determined pursuant to Section 262 of the DGCL or such other applicable Law; <u>provided</u>, <u>however</u>, that if any such holder shall have failed to perfect or shall have effectively withdrawn or lost his or her right to appraisal or dissenters' rights and payment under the DGCL or such other applicable Law, as applicable (whether occurring before, at or after the Effective Time), such holder's shares of Company Common Stock shall thereupon be deemed to have been converted as of the Effective Time into the right to receive the Merger Consideration, without any interest thereon, and such shares shall not be deemed to be Dissenting Shares. Any payments

17

required to be made with respect to the Dissenting Shares shall be made by Parent (and not the Company or Acquisition Sub), and the Aggregate Merger Consideration shall be reduced, on a dollar-for-dollar basis, as if the holder of such Dissenting Shares had not been a stockholder on the Closing Date. The Company shall give prompt written notice to Parent of any demands for appraisal of or dissenters' rights respecting any shares of Company Common Stock, withdrawals of such demands and any other instruments served pursuant to the DGCL or such other applicable Law received by the Company relating to appraisal or dissenters' demands, and Parent shall have the right to participate in all negotiations and proceedings with respect to such demands. Prior to the Effective Time, the Company shall not, without the prior written consent of Parent (which consent shall not be unreasonably withheld or delayed), voluntarily make any payment with respect to, or settle or offer to settle, any such demands, or agree to do or commit to do any of the foregoing.

Section 3.6 Company Equity Awards.

(a) Company Options.

(i) As of the Effective Time, each Company Option that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Vested Company Option (the "**Vested Option Consideration**"); provided, that if the exercise price per share of Company Common Stock underlying such Vested Company Option is equal to or greater than the Merger Consideration, such Vested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof.

(ii) As of the Effective Time, each Company Option that is outstanding and is not a Vested Company Option (each, an "**Unvested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Unvested Company Option (the "**Unvested Option Consideration**"); provided that, if the exercise price per share of Company Common Stock underlying such Unvested Company Option is equal to or greater than the Merger Consideration, such Unvested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested Option Consideration will vest and become payable at the same time as the Unvested Company Option from which such Unvested Option Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time.

18

(b) <u>Company PSUs</u>.

(i) As of the Effective Time, each Company PSU that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company PSU based on the achievement of the applicable performance metrics at the level of performance for which such Vested Company PSU vested in accordance with its terms and (ii) the Merger Consideration (the "**Vested PSU Consideration**").

(ii) As of the Effective Time, each Company PSU that is outstanding immediately prior thereto and that is not a Vested Company PSU (each, an "**Unvested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "**Unvested PSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which such Unvested PSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time).

(c) <u>Company RSAs</u>. At the Effective Time, each Company RSA that is outstanding immediately prior to the Effective Time shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Company RSA and (ii) the Merger Consideration (the "**Unvested RSA Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSA Consideration will vest and become payable at the same time as the Company RSA from which such Unvested RSA Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Company RSA immediately prior to the Effective Time; provided that the Company shall be permitted to accelerate the vesting of any unvested Company RSA if the holder thereof would be subject to Taxes in connection with the Closing as a result of the treatment contemplated by this <u>Section 3.3(c)</u>.

(d) <u>Company RSUs</u>.

(i) As of the Effective Time, each Company RSU that is vested in accordance with its terms as of immediately prior to the Effective Time and each Company RSU held by a non-employee member of the Company Board, in either case, that is outstanding immediately prior to the Effective Time, (each, a "**Vested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company RSU and (ii) the Merger Consideration (the "**Vested RSU Consideration**").

19

(ii) As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "**Unvested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "**Unvested RSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which such Unvested RSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time.

(e) Delivery of Company Equity Award Payments. Parent shall cause the Surviving Corporation to pay through the payroll system of the Surviving Corporation (to the extent applicable) the Vested Option Consideration, the Vested PSU Consideration, and the Vested RSU Consideration to each holder of a Vested Company Option, Vested Company PSU and Vested Company RSU, as applicable, less any required withholding Taxes and without interest, within five (5) Business Days following the Effective Time.

Section 3.7 Company ESPP. As soon as practicable following the date of this Agreement, the Company Board or a committee thereof shall adopt resolutions or take other actions as may be required to provide that (A) the Offering Period (as defined in the Company ESPP) in effect as of the date hereof shall be the final Offering Period (such period, the "**Final Offering Period**") and no further Offering Period shall commence pursuant to the Company ESPP after the date hereof, and (B) each individual participating in the Final Offering Period on the date of this Agreement shall not be permitted to (x) increase his or her payroll contribution rate pursuant to the Company ESPP from the rate in effect when the Final Offering Period commenced or (y) make separate non-payroll contributions to the Company ESPP on or following the date of this Agreement, except as may be required by applicable Law. Prior to the Effective Time, the Company shall take all action that may be necessary to, effective upon the consummation of the Merger, (A) cause the Final Offering Period, to the extent that it would otherwise be outstanding at the Effective Time, to be terminated no later than ten (10) Business Days prior to the date on which the Effective Time occurs; (B) make any pro rata adjustments that may be necessary to reflect the Final Offering Period, but otherwise treat the Final Offering Period as a fully effective and completed Offering Period for all purposes pursuant to the Company ESPP; and (C) cause the exercise (as of no later than ten (10) Business Days prior to the date on which the Effective Time occurs) of each outstanding purchase right pursuant to the Company ESPP. On such exercise date, the Company shall apply the funds credited as of such date pursuant to the Company ESPP within each participant's payroll withholding account to the purchase of whole shares of Company Common Stock in accordance with the terms of the Company ESPP, and such Common Shares shall be entitled to the Merger Consideration in accordance with Section 3.1(b). Immediately prior to and effective as of the Effective Time (but subject to the consummation of the Merger), the Company shall terminate the Company ESPP.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except as disclosed in the Company Disclosure Letter or in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), the Company hereby represents and warrants to Parent and Acquisition Sub as follows:

Section 4.1 Organization and Qualification; Subsidiaries. Each of the Company and its Subsidiaries is a corporation, partnership or other entity duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Company Material Adverse Effect. Each of the Company and its Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Company Material Adverse Effect. The Company's Amended and Restated Certificate of Incorporation (as may be further amended from time to time, the "**Company Certificate of Incorporation**") and the Company's Amended and Restated Bylaws (as may be further amended from time to time, the "**Company Bylaws**"), in each case, as currently in effect, are included in the Company SEC Documents.

Section 4.2 Capitalization.

(a) As of March 31, 2022, the authorized capital stock of the Company consists of (i) 5,000,000,000 shares of Company Common Stock, 763,577,530 of which were issued and outstanding (including 1,386,850 Company RSAs), and none of which were held in treasury, and (ii) 200,000,000 shares of preferred stock, par value $0.000005 per share, of the Company, none of which were issued and outstanding. As of March 31, 2022, there were (i) 953,365 Company Options outstanding, (ii) 2,900,689 Company PSUs outstanding (assuming attainment of the applicable performance metrics at the target level of performance), (iii) 67,575,223 Company RSUs outstanding, and (iv) shares of Company Common Stock subject to outstanding purchase rights under the Company ESPP. Except as described above and other than the Stockholder Rights, the Existing Convertible Notes, the Company Warrant Confirmations and any issuances or grants (or promises or offers to issue or grant) Company Equity Awards since March 31, 2022 in connection with employee hiring, retention or promotions in the ordinary course of business in an amount less than 5,000,000 Company Equity Awards (assuming attainment of the applicable performance metrics at the target level of performance) in the aggregate, as of the date of this Agreement, there are no additional existing and outstanding (i) options, warrants, calls, subscriptions or other rights, convertible securities, agreements or commitments of any character to which the Company or any of its Subsidiaries is a party obligating the Company or any of its

21

Subsidiaries to issue, transfer or sell any shares of capital stock or other equity interests in the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity interests, (ii) contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any capital stock of the Company or any of its Subsidiaries, except pursuant to the other than the Company ASR Confirmations and the Company Bond Hedging Transactions or (iii) voting trusts or similar agreements to which the Company is a party with respect to the voting of the capital stock of the Company, other than the Silver Lake Investment Agreement.

(b) Except as would not be material to the Company and its Subsidiaries, taken as a whole, all of the outstanding shares of capital stock or equivalent equity interests of each of the Company's Subsidiaries are owned of record and beneficially, directly or indirectly, by the Company or the relevant wholly owned Subsidiary (except for de minimis equity interests held by a Third Party for local regulatory reasons) and free and clear of all Liens except for restrictions imposed by applicable securities laws and Permitted Liens.

(c) Prior to the Closing, the Company will provide Parent with a correct and complete list, as of such date, of all outstanding Company Equity Awards, including the holder (by employee identification number), type of Company Equity Award, date of grant, number of shares of Company Common Stock underlying such award (and, if applicable, assuming achievement of the applicable performance metrics at the target level of performance), whether such Company Equity Award is intended to qualify as an "incentive stock option" under Section 422 of the Code, the equity plan pursuant to which the Company Equity Award was granted, and, where applicable, the exercise price per share and expiration date.

22

Section 4.3 <u>Authority Relative to Agreement</u>.

(a) The Company has all necessary corporate power and authority to execute and deliver this Agreement and, assuming the accuracy of the representations and warranties set forth in the second sentence of <u>Section 5.8</u> and subject to obtaining the Company Stockholder Approval and the occurrence of the stockholder advisory vote contemplated by Rule 14a-21(c) under the Exchange Act, regardless of the outcome of such advisory vote (the "**Company Stockholder Advisory Vote**"), to consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by the Company, and assuming the accuracy of the representations and warranties set forth in the second sentence of <u>Section 5.8</u> and except for the Company Stockholder Approval, the occurrence of the Company Stockholder Advisory Vote, no other corporate action or proceeding on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws, now or hereafter in effect, affecting creditors' rights and remedies generally (the "**Enforceability Exceptions**").

(b) The Company Board has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, resolved to recommend that the Company's stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger.

Section 4.4 <u>No Conflict; Required Filings and Consents</u>.

(a) Neither the execution and delivery of this Agreement by the Company nor the consummation by the Company of the transactions contemplated by this Agreement will (i) violate any provision of the Company Certificate of Incorporation or the Company Bylaws or (ii) assuming the accuracy of the representations and warranties set forth in the second sentence of <u>Section 5.8</u> and that the Consents, registrations, declarations, filings and notices referred to in <u>Section 4.4(b)</u> have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected or (iii) except with respect to the Existing Credit Agreement and the Existing Notes, result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of, any Company Material Contract (other than any Company Benefit Plan), other than, in the case of clauses (ii) and (iii) any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Company Material Adverse Effect.

23

(b) No consent, approval, clearance, license, permit, order or authorization (each of the foregoing, a "**Consent**") of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to the Company or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which the Company or any of its Subsidiaries is qualified to do business, (iii) the applicable requirements under corporation or Blue Sky Laws of various states, (iv) such filings as may be required in connection with the Taxes described in Section 8.6, (v) filings with the New York Stock Exchange, (vi) such other items required solely by reason of the participation of Parent or Acquisition Sub or any of their Affiliates in the transactions contemplated by this Agreement, (vii) compliance with and filings or notifications under the HSR Act and any other applicable U.S. or foreign competition, antitrust or merger control Laws (together with the HSR Act, "**Antitrust Laws**"), (viii) compliance with and filings or notifications under any applicable Foreign Investment Laws, and (ix) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Company Material Adverse Effect.

Section 4.5 Permits; Compliance With Laws.

(a) As of the date of this Agreement, the Company and its Subsidiaries are in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders necessary for the Company and its Subsidiaries to carry on their respective business as it is now being conducted (the "**Company Permits**") and all Company Permits are in full force and effect and no suspension or cancellation of any of the Company Permits is pending or, to the Knowledge of the Company, threatened, except where the failure to be in possession of or be in full force and effect, or the suspension or cancellation of, any of the Company Permits would not have a Company Material Adverse Effect.

(b) Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound, except for any such defaults or violations that would not have a Company Material Adverse Effect. Notwithstanding the foregoing, no representation or warranty in Section 4.5(a) or this Section 4.5(b) is made with respect to Company SEC Documents or financial statements, "disclosure controls and procedures" or "internal control over financial reporting," employee benefits matters, Intellectual Property Rights matters, Tax matters, which are addressed exclusively in Section 4.6 (Company SEC Documents; Financial Statements), Section 4.8 (Disclosure Controls and Procedures), Section 4.12 (Employee Benefit Plans), Section 4.14 (Intellectual Property Rights), Section 4.15 (Taxes), respectively.

24

<u>Section 4.6 Company SEC Documents; Financial Statements</u>.

(a) Since January 1, 2022, the Company has filed or furnished with the SEC all material forms, documents and reports required to be filed or furnished prior to the date of this Agreement by it with the SEC (such forms, documents and reports filed with the SEC, including any amendments or supplements thereto and any exhibits or other documents attached to or incorporated by reference therein, the "**Company SEC Documents**"). As of their respective dates, or, if amended or supplemented, as of the date of the last such amendment or supplement, the Company SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents at the time it was filed (or, if amended or supplemented, as of the date of the last amendment or supplement) contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading.

(b) The consolidated financial statements (including all related notes) of the Company included in the Company SEC Documents fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as at the respective dates thereof and its consolidated statements of operations and consolidated statements of cash flows for the respective periods then ended (subject, in the case of unaudited interim statements, to normal year-end audit adjustments, none of which would have a Company Material Adverse Effect, to the absence of notes and to any other adjustments described therein, including in any notes thereto) in conformity with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q, Form 8-K or any successor form or other rules under the Exchange Act).

<u>Section 4.7 Information Supplied</u>. None of the information supplied or to be supplied by or on behalf of the Company or any of its Subsidiaries expressly for inclusion or incorporation by reference in the proxy statement relating to the matters to be submitted to the Company's stockholders at the Company Stockholders' Meeting (such proxy statement and any amendments or supplements thereto, the "**Proxy Statement**") shall, at the time the Proxy Statement is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading at such applicable time, except that no representation or warranty is made by the Company with respect to statements made therein based on information supplied, or required to be supplied, by Parent or its Representatives in writing expressly for inclusion therein. The Proxy Statement will comply as to form in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder.

<u>Section 4.8 Disclosure Controls and Procedures</u>. The Company has established and maintains "disclosure controls and procedures" and "internal control over financial reporting" (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 promulgated under the Exchange Act) as required by Rule 13a-15 promulgated under the Exchange Act. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date of this Agreement, to the Company's auditors and the

25

audit committee of the Company Board (i) any significant deficiencies and material weaknesses in the design or operation of its internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (ii) any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.9 Absence of Certain Changes or Events. Since January 1, 2022 and until the date of this Agreement, (a) the businesses of the Company and its Subsidiaries have been conducted in the ordinary course of business (other than as a result of COVID-19 and COVID-19 Measures or with respect to the Existing 2030 Notes or the transactions contemplated hereby) and (b) there has not been any adverse change, event, development or state of circumstances that has had a Company Material Adverse Effect.

Section 4.10 No Undisclosed Liabilities. Except (a) as reflected, disclosed or reserved against in the Company's financial statements (as amended or restated, as applicable) or the notes thereto included in the Company SEC Documents, (b) for liabilities or obligations incurred in the ordinary course of business since December 31, 2021, (c) the Existing 2030 Notes, (d) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement, including the Merger, or (e) for liabilities or obligations that would not have a Company Material Adverse Effect, as of the date of this Agreement, the Company and its Subsidiaries do not have any liabilities of any nature, whether or not accrued, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet (or in the notes thereto) of the Company.

Section 4.11 Litigation. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, that would have a Company Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the Knowledge of the Company, investigation by any Governmental Authority involving the Company or any of its Subsidiaries that would have a Company Material Adverse Effect. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing seeking to prevent, hinder, modify, delay or challenge the Merger or any of the other transactions contemplated by this Agreement.

Section 4.12 Employee Benefit Plans.

(a) Prior to the Closing, the Company will provide a true and complete list, as of the date of this Agreement, of each material Company Benefit Plan (which list may reference a form of such Company Benefit Plan). Prior to the Closing, the Company will make available to Parent a true and complete copy of each material Company Benefit Plan and all amendments thereto and a true and complete copy of the following items (in each case, only if applicable): (i) each trust or other funding arrangement; (ii) each current summary plan description and current summary of material modifications; (iii) the most recently filed annual report on IRS Form 5500; and (iv) the most recently received IRS determination letter or IRS opinion letter.

26

(b) Except as would not have a Company Material Adverse Effect:

(i) each of the Company Benefit Plans has been maintained, operated, administered and funded in accordance with its terms and in compliance with applicable Laws;

(ii) there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan;

(iii) neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code); and

(iv) each Foreign Plan (A) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing, (B) that is intended to qualify for special Tax treatment meets all requirements for such treatment, and (C) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws.

(e) If, and to the extent, the execution or delivery of this Agreement or the consummation of the Merger (either alone or in combination with another event) will: (i) entitle any Company Service Provider to any material payment; (ii) materially increase the amount or value of any benefit or compensation or other obligation payable or required to be provided to any Company Service Provider; (iii) accelerate the time of payment or vesting of amounts due to any Company Service Provider or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits in respect of any of the Company Benefit Plans; (iv) give rise to the payment of any amount by the Company or any of its Subsidiaries that would be non-deductible by reason of Section 280G of the Code, then, prior to the Closing, the Company will provide a true and complete list of each Company Benefit Plan that would trigger any of (i) through (iv) above. There is no contract, agreement, plan or arrangement to which the Company or any of its Subsidiaries is a party by which it is required by its terms to compensate, gross-up, indemnify, or otherwise reimburse any Person for excise Taxes imposed pursuant to Section 4999 or Section 409A of the Code.

(f) Except as would not have a Company Material Adverse Effect, there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan.

27

(g) Except as would not have a Company Material Adverse Effect, neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code).

(h) Except as would not have a Company Material Adverse Effect, each Foreign Plan (i) has been maintained, operated and administered in compliance with its terms and in compliance with applicable Laws; (ii) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing; (iii) that is intended to qualify for special Tax treatment meets all requirements for such treatment; (iv) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws; and (v) is not subject to any pending or, to the Knowledge of the Company, threatened claims by or on behalf of any participant in any Foreign Plan, or otherwise involving any such Foreign Plan or the assets of any Foreign Plan, other than routine claims for benefits.

Section 4.13 Labor Matters. If, and to the extent that, the Company or any of its Subsidiaries is a party to or bound by any works council or collective bargaining agreement and no employees of the Company or any of its Subsidiaries are represented by a labor organization with respect to their employment with the Company or any of its Subsidiaries, then, prior to the Closing, the Company will provide a true and complete list of each such works council or collective bargaining agreement, or labor organization, as applicable. There are no labor related strikes, walkouts or work stoppages pending or, to the Knowledge of the Company, threatened in writing.

Section 4.14 Intellectual Property.

(a) Except as would not have a Company Material Adverse Effect, the Company and its Subsidiaries solely and exclusively own all patents, trademarks, trade names, copyrights, Internet domain names, service marks, trade secrets and other intellectual property rights (the "**Intellectual Property Rights**") purported to be owned by the Company and its Subsidiaries (the "**Company Intellectual Property**"), free and clear of all Liens, except Permitted Liens.

(b) To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person, except for any such infringement, misappropriation or other violation that would not have a Company Material Adverse Effect. To the Knowledge of the Company, no other Person is infringing, misappropriating or otherwise violating any Company Intellectual Property, except for any such infringement, misappropriation or other violation as would not have a Company Material Adverse Effect.

28

The Company and its Subsidiaries are in compliance with all applicable Laws, Contracts to which the Company or its Subsidiaries are bound, and internal- and external-facing policies of the Company or its Subsidiaries, in each case, relating to privacy, data protection, and the collection and use of information that constitutes "personal information" under applicable Laws ("**Personal Information**") collected, used or held for use by the Company or its Subsidiaries, except where the failure to be in compliance would not have a Company Material Adverse Effect.

(e) Neither the Company nor any of its Subsidiaries has experienced any unauthorized access to the information technology systems owned or used by the Company or its Subsidiaries or Personal Information collected, used, held for use or otherwise processed by the Company or its Subsidiaries, except as would not have a Company Material Adverse Effect.

Section 4.15 Taxes.

(a) Except as would not have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have timely filed all Tax Returns (taking into account any extensions) required to be filed, and such Tax Returns (taking into account all amendments thereto) are complete and accurate, and (ii) all Taxes required to be paid by the Company and its Subsidiaries have been paid.

(b) Except as would not have a Company Material Adverse Effect, (i) neither the Company nor any of its Subsidiaries has received written notice of any audit, examination, investigation or other proceeding from any Governmental Authority in respect of liabilities for Taxes of the Company or any of its Subsidiaries, which have not been fully paid or settled; (ii) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens; (iii) with respect to any tax years open for audit as of the date of this Agreement, neither the Company nor any of its Subsidiaries has granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Tax; and (iv) neither the Company nor any of its Subsidiaries has any liability for the Taxes of any Person (other than the Company and its Subsidiaries) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business the primary purpose of which does not relate to Tax) or otherwise by operation of law.

(c) Neither the Company nor any of its Subsidiaries has engaged in any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2) in any tax year for which the statute of limitations has not expired.

(d) The Company is not nor has been during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(e) Except with respect to Section 4.12, the representations in this Section 4.15 are the sole and exclusive representations and warranties concerning Tax matters.

29

<u>Section 4.16 Material Contracts</u>.

(a) For purposes of this Agreement, "**Company Material Contract**" means any Contract (other than any Company Benefit Plan) to which the Company or any of its Subsidiaries is a party or by which their respective properties or assets are bound, except for this Agreement, that constitutes a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act).

(b) Neither the Company nor any of its Subsidiaries is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. To the Knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. Each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary and, to the Knowledge of the Company, the other parties thereto, except such as would not have a Company Material Adverse Effect; <u>provided</u> that (i) such enforcement may be subject to the Enforceability Exceptions and (ii) the remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

<u>Section 4.17 RESERVED</u>.

<u>Section 4.18 RESERVED</u>.

<u>Section 4.19 Takeover Statutes</u>. Assuming the accuracy of the representation contained in <u>Section 5.8</u>, the Company Board has taken such actions and votes as are necessary to render the provisions of any "fair price," "moratorium," "control share acquisition" or any other takeover or anti-takeover statute or similar federal or state Law inapplicable to this Agreement, the Merger or any other transactions contemplated by this Agreement.

<u>Section 4.20 Vote Required</u>. Assuming the accuracy of the representation contained in <u>Section 5.8</u>, the adoption of this Agreement by the affirmative vote of a majority of the outstanding shares of Company Common Stock entitled to vote to adopt this Agreement (the "**Company Stockholder Approval**") are the only votes of holders of securities of the Company that are required to consummate the Merger.

<u>Section 4.21 Brokers</u>. Except for Goldman Sachs & Co. LLC ("**Goldman Sachs**"), J.P. Morgan Securities LLC ("**J.P. Morgan**") and Allen & Company LLC, each of whose fees and expenses shall be borne solely by the Company, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

30

Section 4.22 Opinions of Financial Advisors. The Company Board has received the oral opinion of Goldman Sachs (to be followed by delivery of a written opinion as of the date hereof), to the effect that, as of such date, and based upon and subject to the limitations, qualifications and assumptions set forth in the written opinion of Goldman Sachs, the Merger Consideration to be paid to the holders of Company Common Stock (other than the Equity Investor, Parent and their respective Affiliates) pursuant to this Agreement is fair from a financial point of view to such holders. On or prior to the date of this Agreement, the Company Board has received the opinion of J.P. Morgan to the effect that, as of the date of such opinion and subject to the assumptions, limitations, qualifications and other factors set forth therein, the Merger Consideration to be paid to holders of Company Common Stock pursuant to this Agreement is fair, from a financial point of view, to such holders.

Section 4.23 Rights Agreement. The Company has taken all action necessary to render the Stockholder Rights Plan, inapplicable to the Merger and this Agreement and the transactions contemplated hereby.

Section 4.24 RESERVED.

Section 4.25 No Other Representations or Warranties. Except for the representations and warranties expressly set forth in this Article IV, neither the Company nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to the Company or any of its Subsidiaries or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to Parent and the Acquisition Sub or any of their Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither the Company nor any other Person makes or has made any express or implied representation or warranty to Parent, Acquisition Sub or any of their respective Representatives with respect to (a) any financial projection, forecast, estimate or budget relating to the Company, any of its Subsidiaries or their respective businesses or, (b) except for the representations and warranties made by the Company in this Article IV, any oral or written information presented to Parent, Acquisition Sub or any of their respective Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or the course of the Merger, or the accuracy or completeness thereof.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB

Except as disclosed in the Parent Disclosure Letter, Parent and Acquisition Sub hereby jointly and severally represent and warrant to the Company as follows:

Section 5.1 Organization and Qualification.

(a) Each of Parent and Acquisition Sub is a corporation duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Parent Material Adverse Effect. Each of Parent and Acquisition Sub is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Parent Material Adverse Effect.

31

(b) As of the date of this Agreement, the authorized share capital of Acquisition Sub consists of 1,000 shares, $0.01 par value per share, all of which are validly issued and outstanding. All of the issued and outstanding share capital of Acquisition Sub is, and at the Effective Time will be, owned by Parent. Acquisition Sub was formed solely for the purpose of acquiring the Company, and it has not conducted any business prior to the date of this Agreement and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and other transactions contemplated by this Agreement.

(c) As of the date of this Agreement, all of the issued and outstanding share capital of Parent is owned by the Equity Investor.

Section 5.2 Authority Relative to Agreement.

(a) Parent and Acquisition Sub have all necessary corporate power and authority to (a) execute and deliver this Agreement, (b) perform its covenants and obligations hereunder and (c) consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by Parent and Acquisition Sub, and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by Parent and Acquisition Sub, and no other corporate action or proceeding on the part of Parent and Acquisition Sub is necessary to authorize the execution, delivery and performance of this Agreement by Parent and Acquisition Sub and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by Parent and Acquisition Sub and, assuming the due authorization, execution and delivery of this Agreement by the other party hereto, constitutes a legal, valid and binding obligation of Parent and Acquisition Sub, enforceable against Parent and Acquisition Sub in accordance with its terms, except that such enforceability may be subject to the Enforceability Exceptions.

(b) The Parent Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger, and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and its stockholders, as applicable. No vote of, or consent by, the holders of any class or series of capital stock of Parent is necessary to authorize the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement or otherwise required by the certificate of incorporation or bylaws of Parent, applicable Law (including any stockholder approval provisions under the rules of any applicable securities exchange) or any Governmental Authority.

(c) The Acquisition Sub Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (ii) directed that this Agreement be submitted for consideration by Acquisition Sub's sole stockholder and (iii) recommended that the sole stockholder of Acquisition Sub approve the Merger. Parent, acting in its capacity as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger, and no further vote is required.

Section 5.3 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by Parent and Acquisition Sub nor the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement will (i) violate any provision of Parent's or its Subsidiaries' certificates of incorporation or bylaws, (ii) assuming that the Consents, registrations, declarations, filings and notices referred to in Section 5.3(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to Parent or any of its Subsidiaries or by which any property or asset of Parent or any of its Subsidiaries is bound or affected or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of any Contract to which Parent or any of its Subsidiaries is a party, or by which any of their respective properties or assets is bound, other than, in the case of clauses (ii) and (iii), any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Parent Material Adverse Effect.

(b) No Consent of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to Parent or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which Parent or any of its Subsidiaries is qualified to do business, (iii) such filings as may be required in connection with the Taxes described in Section 8.6, (iv) such other items required solely by reason of the participation of the Company in the transactions contemplated by this Agreement, (v) compliance with and filings or notifications under the HSR Act, other Antitrust Laws (vi) compliance with and filings or notifications under any Foreign Investment Laws, and (vii) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Parent Material Adverse Effect.

Section 5.4 Financing. Parent has delivered to the Company true, correct and complete copies of the duly executed (i) debt commitment letter, dated as of April 25, 2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto, Parent and Acquisition Sub, together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Bank Debt Commitment Letter**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to Acquisition Sub for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Bank Debt Financing**"), (ii) debt commitment letter, dated as of April 25,

33

2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto and X Holdings III, LLC, a Delaware limited liability company (the "**Margin Loan Borrower**"), together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Margin Loan Commitment Letter**" and, together with the Bank Debt Commitment Letter, the "**Debt Commitment Letters**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to the Margin Loan Borrower for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Margin Loan Financing**" and, together with the Bank Debt Financing, the "**Debt Financing**") and (iii) an equity commitment letter from the Equity Investor, dated as of the date hereof (including all exhibits, schedules, annexes and amendments thereto as of the date of this Agreement, the "**Equity Commitment Letter**" and, together with the Debt Commitment Letters, the "**Financing Commitments**") pursuant to which the Equity Investor has committed to invest the amounts set forth therein (the "**Equity Financing**" and, together with the Debt Financing, the "**Financing**"); provided that the fee and other economic provisions (including "flex" provisions) of fee letters may be redacted in a customary manner so long as none of the redacted terms would (i) reduce the amount of the Debt Financing below the amount that is required to pay the Funded Obligations, (ii) impose any new condition or otherwise adversely amend, modify or expand any conditions precedent to the Debt Financing or (iii) affect the enforceability or impair the validity of, or prevent, impede or delay the consummation of, the Debt Financing at the Closing. As of the date hereof, each of Parent and Acquisition Sub has accepted and is a party to the Bank Debt Commitment Letter, the Margin Loan Borrower has accepted and is a party to the Margin Loan Commitment Letter, and the Financing Commitments are in full force and effect and, are legal, valid and binding obligations of the Equity Investor, Parent and Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of the Equity Investor, Parent, Acquisition Sub and the Margin Loan Borrower, each of the other parties thereto, enforceable in accordance with their respective terms against the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of Parent and Acquisition Sub, against each of the other parties thereto. As of the date hereof, the Financing Commitments, and the respective commitments or obligations thereunder, have not been withdrawn, terminated, reduced, repudiated, rescinded, amended, supplemented or modified, in any respect, and no such withdrawal, termination, reduction, repudiation, rescission, amendment, supplement or modification is contemplated by the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or, to the knowledge of Parent and Acquisition Sub, any other party thereto. None of the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower nor any of their respective Affiliates has, nor has, to the knowledge of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, any other party to the Financing Commitments, committed any breach or threatened breach of the performance, observance or fulfillment of any covenants, conditions or other obligations set forth in, or is in default under, any of the Financing Commitments. No event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (i) constitute or result in a breach or default on the part of Parent, Acquisition Sub, Margin Loan Borrower or any of the other parties thereto (including the Financing Sources) under the Financing Commitments, (ii) constitute or result in a failure to satisfy a condition or other contingency set forth in the Financing Commitments, or (iii) otherwise result in any portion of the Debt Financing or the Equity Financing not being available on the Closing Date. None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, nor any

34

of their respective Affiliates has any reason to believe (both before and after giving effect to any "flex" provisions contained in the Debt Commitment Letters) that it will be unable to satisfy, on a timely basis (and in any event, not later than the Closing), any condition to be satisfied by it (or otherwise within the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's any of their respective Representatives' or Affiliates' control) contained in the applicable Financing Commitments or that the full amounts committed pursuant to the applicable Financing Commitments will not be available as of the Closing. There are no conditions precedent or other contingencies or conditions related to the Financing other than those conditions expressly set forth in the unredacted provisions of the Financing Commitments, and there are no side letters, understandings or other agreements, Contracts or arrangements of any kind relating to the Financing Commitments or the Financing that could adversely affect the availability, conditionality, enforceability or amount of the Financing contemplated by the Financing Commitments. As of the date of this Agreement, Parent, Acquisition Sub, the Margin Loan Borrower and/or their respective Affiliates have fully paid any and all commitment fees or other fees or deposits required by the applicable Financing Commitments to be paid on or before the date of this Agreement. The aggregate proceeds from the Financing are sufficient in amount to provide Parent and Acquisition Sub with the funds necessary to consummate the transactions contemplated hereby and to satisfy their obligations under this Agreement, including for Parent to pay (or cause to be paid) the aggregate amounts payable pursuant to <u>Article II</u> and the payment of all fees, costs and expenses to be paid by Parent related to the transactions contemplated by this Agreement, including such fees, costs and expenses relating to the Financing, and payment of all amounts in connection with the refinancing or repayment of any outstanding indebtedness of the Company required by this Agreement or the Financing Commitments (collectively, the "**Funding Obligations**"). Notwithstanding anything contained in this Agreement to the contrary, the Equity Investor, Parent and Acquisition Sub each acknowledge and affirm that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing (including the Debt Financing) for any of the transactions contemplated by this Agreement. As of the date of this Agreement, the Equity Investor owns, directly or indirectly, all the issued and outstanding capital stock and other equity interests of the Margin Loan Borrower.

Section 5.5 Information Supplied. None of the information supplied or required to be supplied by or on behalf of Parent or any of its Representatives expressly for inclusion or incorporation by reference in the Proxy Statement shall, at the time it is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 5.6 Brokers. Except for Morgan Stanley & Co. LLC, Bank of America Merrill Lynch and Barclays, each of whose fees and expenses shall be borne solely by Parent, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent, Acquisition Sub, or any of their respective Subsidiaries.

<u>Section 5.7 Compliance With Laws</u>.

(a) Neither the Parent, Acquisition Sub nor any of their Affiliates is in default or violation of any applicable Law, except for any such defaults or violations that would not have a Parent Material Adverse Effect.

(b) As of the date of this Agreement, there is no suit, action or proceeding pending or, to the knowledge of Parent, threatened in writing against Parent, Acquisition Sub or any of their Affiliates, that would have a Parent Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the knowledge of Parent, investigation by any Governmental Authority involving Parent, Acquisition Sub or any of their Affiliates or any of the transactions contemplated hereby that would have a Parent Material Adverse Effect.

<u>Section 5.8 Ownership of Company</u>. As of the date hereof, the Equity Investor, Parent and Acquisition Sub beneficially own, in the aggregate, 73,115,038 shares of Company Common Stock (the "**Parent Owned Shares**"). None of Parent, Acquisition Sub or any of their respective directors, officers, general partners or Affiliates has been an "interested stockholder" (as defined in Section 203 of the DGCL) of the Company, in each case during the three years prior to the date of this Agreement.

<u>Section 5.9 Solvency</u>. Neither Parent nor Acquisition Sub is entering into this Agreement with the actual intent to hinder, delay or defraud either present or future creditors of the Company or any of its Subsidiaries. Parent is Solvent as of the date of this Agreement, and each of Parent and the Company and its Subsidiaries (on a consolidated basis) will, after giving effect to the Merger or any other transaction contemplated by this Agreement, including the funding of the Financing, payment of the Funding Obligations, and payment of all other amounts required to be paid in connection with the consummation of the Merger or any other transaction contemplated by this Agreement and the payment of all related fees and expenses, be Solvent at and immediately after the Closing. As used in this <u>Section 5.8</u>, the term "**Solvent**" shall mean, with respect to a particular date, that on such date, (a) the sum of the assets, at a fair valuation, of Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) will exceed their debts, (b) Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) has not incurred and does not intend to incur, and does not believe that it will incur, debts beyond its ability to pay such debts as such debts mature, and (c) Parent has and, after the Closing, the Surviving Corporation and its Subsidiaries (on a consolidated basis) and of each of them (on a stand-alone basis) will have, sufficient capital and liquidity with which to conduct its business. For purposes of this <u>Section 5.8</u>, "debt" means any liability on a claim, and "claim" means any (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

<u>Section 5.10 Parent Guarantee</u>. Parent has furnished the Company with a true, complete and correct copy of the Parent Guarantee. The Parent Guarantee is in full force and effect and has not been amended, modified or terminated. The Parent Guarantee is a (i) legal, valid and binding obligation of the Guarantor and of each of the parties thereto and (ii) enforceable in accordance with its respective terms against the Guarantor and each of the other parties thereto. There is no default under the Parent Guarantee by the Guarantor, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder by the Guarantor.