IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE


CORNET, et al.,           )
                          )
        Plaintiffs,       )   C.A. No. 23-441-TMH
                          )
v.                        )
                          )
TWITTER, INC.,            )
                          )
        Defendant.        )



                   Thursday, January 16, 2025
                   12:06 p.m.
                   Courtroom 6B



                   844 King Street
                   Wilmington, Delaware



BEFORE:   THE HONORABLE TODD M. HUGHES
      United States District Court Judge



APPEARANCES:


        KATE BUTLER LAW, LLC
        BY:  KATHERINE BUTLER, ESQ.

        -and-

        LICHTEN & LISS-RIORDAN, P.C.
        BY:  SHANNON LISS-RIORDAN, ESQ.
        BY:  BRADLEY MANEWITH, ESQ.

                          Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORGAN, LEWIS & BOCKIUS, LLP
BY:  JODY BARILLARE, ESQ.
BY:  T. CULLEN WALLACE, ESQ.

Counsel for the Defendant

----------------------------

COURT CLERK:  All rise.  Court is now in session.  The Honorable Todd M. Hughes presiding.

THE COURT:  Good morning, everybody.  Please be seated.

Okay.  Welcome, everybody.  I tend to do these things like I do my appellate arguments just because that's the way I do things.  So I won't put strict time limits on you, but I plan for about 15 to 20 minutes per side.  If you need longer, feel like we have to go over, I've read the papers, I'm pretty familiar with what's going on, but we'll get through it and I'll let you know when I don't need to hear from you anymore.

Let's start with the movant.

MR. BARILLARE:  Good morning, Your Honor.  Jody Barillare from Morgan Lewis on behalf defendant Twitter.  I'm today by my colleague, Cullen Wallace also from Morgan Lewis.  And with Your Honor's permission, Mr. Wallace will

be handling the argument today.

THE COURT:  Okay.  Thanks.

MR. BARILLARE:  Thank you, Your Honor.

MS. BUTLER:  Good morning, Your Honor.  Kate -- I rise today to introduce myself.  Kate Butler.  I am Delaware counsel.  With me is today Shannon Liss-Riordan, who will be arguing, and Brad Manewith as well, who has been admitted pro hac vice.

THE COURT:  Thank you.

MR. WALLACE:  Thank you, Your Honor.  May it please the Court.  As a starting point, while plaintiffs live complaint, which was filed December 9, 2022, contains eight named plaintiffs and seven causes of action, five of the plaintiffs have since been dismissed in the District of California through a motion to compel arbitration and four other claims have been voluntary dismissed by the plaintiff, so there are currently three plaintiffs before the Court on three causes of action.

The three remaining plaintiffs are Emily Kim. Ms. Kim asserts in her complaint that she lives in Washington and worked for Twitter in Seattle, Washington. Plaintiff Brett Folkins, likewise, reports to have lived in Seattle, Washington, and worked for Twitter in Seattle, Washington.  And plaintiff Miguel Barrato alleges he lived in New York and worked for Twitter in New York.

The remaining causes of action are breach of the merger agreement, which plaintiffs seek to assert as third-party beneficiaries, breach of contract and promissory estoppel.  Through all three of these claims, plaintiffs seek a severance of which they're entitled as a result of being terminated after the closing of the Twitter merger agreement.

For the reasons we discussed, Twitter moves to dismiss all three of these claims, starting with the breach of the merger agreement claim.

By way of brief background, Twitter and X Corp., and Mr. Musk for certain portions of the merger agreement, entered into the agreement on April 26, 2020, and the merger closed October 27, 2022.  Plaintiffs are not party to the merger agreement, but seek to enforce Section 6.9(a) of the agreement as alleged third-party beneficiaries.  It's a general provision that says post closing of the merger, i.e., employees will continue to receive benefits at the same level they received.

THE COURT:  Sir, I'm familiar with that.  And I understand you're going to point me to a bunch of clauses saying no third-party benefits rights.  I read all that.  So I guess my question on this point is if that's the case, then what's the point of 6.9(a) or who would be able to enforce that, if at all?

MR. WALLACE:  So I think 6.9(a) is just a general provision.  I think the specific provision and the general specific canon is 6.9(e)(i) and (ii), which says, "nothing express or implied" in the provision --

THE COURT:  Right.

MR. WALLACE:  -- "creates a continuing obligation for the buyer of the company to provide any severance benefits at all."  And obviously 6.9(e)(ii), which says that these individual or former employees are not third-party beneficiaries under that provision.  I think -- I think the notion that if someone can't enforce it, to me that falls into the rubric of we're trying to figure out whether there is some kind of third-party beneficiary out there who might be able to enforce it.  But in a case like this where the parties have clearly indicated their intent, which is the hallmark of the analysis, the intent that this person not been able to enforce it, that rules the day.

THE COURT:  What do you think the point of that language is then in 6.9(a)?

MR. WALLACE:  I think it says what it says.  I can't speak to the intent of it, I just know what the intent was of the parties was in saying it can be changed any time was a clear breach of contract and that these individuals aren't considered third-party beneficiaries, under Delaware law, you know, such a provision that has three different

carve outs under 9.7 and then this express carve out under 6.9 make clear that that means the individuals who are seeking to enforce as third parties are not intended beneficiaries and can't.

THE COURT: Okay. Let me just tell you, I should have probably told you at the outset and you go back to this, and also for the other side. I have read Judge Burke's opinion on very related claims, so I kind of want you to -- because I understand he dismissed the third-party beneficiary claims, but didn't dismiss the other two. Those are very similar to the ones here, as I understand it. So I think it would be helpful, in explaining the grounds, why you've also either distinguished or just think his decision is incorrect on those points.

MR. WALLACE: So obviously we think his decision was correct. But as to the contract claims, which are at issue here, I would say that, you know, one, we are objecting, if we haven't done so. I think we have already done so to those findings. And two, that that was dealing with a different complaint. That was dealing with a 60-something page complaint that had all different number of allegations and things we disagree with, but it has much more in it than the rather sparse complaint at issue here that we're attacking on 12(b)(6) grounds for failure to articulate and identify specific contracts and reasonable

reliance and all those sorts of things.  So I think that's what distinguishes this case from that case.

THE COURT:  What specifically does this complaint lack that was present?  Can I just refer to the them as the Arnold plaintiffs, because I think that's Arnold, right?

MR. WALLACE:  That's right.  I would say it's a starting point.  This complaint is framed in the context of the severance benefits will be owed should layoffs occur. Of the three plaintiffs, Mr. Folkins wasn't laid off.

THE COURT:  Okay.

MR. WALLACE:  That's just a for example.  He -- you know, all the seven of the eight plaintiffs, other than Mr. Folkins, state in paragraphs 9 through 50 of the complaint, quote, that they were laid off.  Mr. Folkins had received an e-mail after the other individuals had been laid off that said click a button within 24 hours to confirm your willingness to continue to be employed by Twitter and he didn't.  Under any kind of definition, that's not a layoff. That's, if anything, a voluntary resignation and a decision not to go forward as an employee of Twitter.  So under the way this case is pled, that layoff was a precondition to getting the severance benefits they're seeking, Mr. Folkins wouldn't qualify and his claim should be dismissed.  All three of his claims, merger agreement, breach of contract

and promissory estoppel should be dismissed.  This case also involves --

THE COURT:  What about the other two left.  They were laid off, right?

MR. WALLACE:  The other 2, I think there's something interesting here about this as well, which is while they don't plead -- they being the plaintiffs don't plead what law applies to their language, which I think makes it deficient on its face, as we discussed earlier, one resides in Washington, one resides in New York.  As an element of promissory estoppel, just to go straight to the elements of the claim, the promissor, under the Washington law, has to show that the person who made the promise, the promissor changed his position on reliance to the promise and the employee must actually change his position to his detriment and reliance on the promise.  Same under New York law, which also requires that the employee change his position.  That's Southern District of New York, *Drummond v. Akselrad*, quote, as opposed to a breach of contract, the wrong in a promissory estoppel claim is not primarily in depriving the plaintiff of the promised reward, but in causing the plaintiff to change a position to his detriment.

Here in this case, the allegation is not that the plaintiffs change anything to their detriment.  In fact, they plead repeatedly they did nothing.  They sent her out

for six months and received a paycheck.  In paragraph 31 they allege, employees for the remaining plaintiffs reasonably relied on these promises and maintained their employment at Twitter rather than seeking job opportunities elsewhere.  Same in paragraph 42.  Based on that promise, that promise being the severance promise, they did not seek or obtain employment elsewhere.  They did not change their position based on the clear allegations in the complaint.

THE COURT:  Why isn't reliance -- why isn't continuing to work for Twitter rather than leaving based upon the promises of continued benefits and pay and possible severance reliance, just because they haven't left?

MR. WALLACE:  Right.  But in order to prove promissory estoppel under Washington and New York law, you must show that you forewent another opportunity.  For instance, you applied for a job elsewhere and got it, but didn't leave because you were waiting on this other promise.  And that's what they're lacking here.  They said, oh, there's this promise out there, I'm not going to go do anything, they didn't forego any opportunity to their detriment, they didn't change position, they stayed where they were.

THE COURT:  What about the breach of contract claim?

MR. WALLACE:  The breach of contract claim, as

pled here, is merely recitation of the merger agreement claim. It's a way of trying to get around the fact they're not third-party beneficiaries of the merger agreement. In paragraph 27 --

THE COURT: Not relying on anything beyond the merger agreement?

MR. WALLACE: Well, I think, I think the fact that they don't identify what the contract is with any level of specificity, they don't detail the terms of any kind of contract other than just repeating and parroting what the merger agreement says, all of those reasons that we lay out in our brief show that they haven't adequately pled their claim for breach of contract.

THE COURT: Did they not rely on the FAQ like the Arnold plaintiffs?

MR. WALLACE: They make one reference to the FAQ, but they don't talk about which provision of the FAQ, what the FAQ said in any material respect when they received the FAQ, when they looked at it, who provided it to them. There's a lot of the factual detail missing. I will say, to your point, when it comes to promissory estoppel I think the law is pretty clear the change of position is dispositive. Breach of contract, I'm not saying they couldn't potentially remedy the issues with their pleading, more that they didn't.

THE COURT:  So let me see if I can get this straight.  For this specific case and looking at the Arnold decision, the distinctions you're making are based not on actual distinctions, it's the way they pled their complaints?

MR. WALLACE:  Right.

THE COURT:  Okay.  Except for the other guy, what's his name?

MR. WALLACE:  Mr. Folkins.

THE COURT:  Setting aside him, but the other two are at least factually situated to the Arnold plaintiffs, but you find their complaint deficient?

MR. WALLACE:  I don't find them factually similar.  The way they pled their allegations is distinguishable.

THE COURT:  I understand that, but if we know anything about their actual positions and were they somehow different or treated differently than the Arnold plaintiffs? I guess we don't know because we haven't gotten past the motion to dismiss into discovery.

MR. WALLACE:  That's right, Your Honor.

THE COURT:  Can I just ask you one more question.  There's the third case.

MR. WALLACE:  *Woodfield*, Your Honor.

THE COURT:  *Woodfield*, yeah.  What's going on in

*Woodfield?*  Did you have a motion to dismiss pending there too?

MR. WALLACE:  Yes, Your Honor.  I believe we've fully briefed in *Woodfield*.  I recall that case may be stayed, but I apologize, I'm not certain.  We're fully briefed there.  I don't know if we're stayed or not.

THE COURT:  Not to pull any punches or hide the ball, those cases are both coming to me too, so we'll be dealing with those two as well.  But so I guess your objection to Judge Burke is going to come to me now.  It hasn't been done yet, so -- but I've arranged it.  So while you're here, it didn't make sense to have two different judges in the same district to handle this.  So that's why I'm asking you about those other cases.  We won't dive into them too much, but, you know, I'll be dealing with those as well at some point.

So I guess what I'm getting back to is for the Arnold decision, I think that Judge Burke relied heavily on that FAQ and some other things.  Is it your position that that doesn't exist with these plaintiffs or they just didn't plead it?

MR. WALLACE:  Well, our position would be that they didn't plead it to start with.  If you want to talk about the FAQ, I think the FAQ was many pages long and I think -- there's two parts that appear to be at issue in

most of these cases.  One part says here's what the merger agreement says or purports to repackage what the merger agreement says.  One other part of the FAQ, put together at some point later, says, "generally speaking, our current severance package in the event of position elimination, provides for X benefits."  That's the sum total of what the FAQs say that the plaintiffs in all these cases have been relying on.

So we take the position that those aren't clear and definite promises, that if you -- you know, there's no promise that if you remain employed throughout all of this, this is what you're going to get if you're terminated after the fact.  There's no such promise in any of the FAQs or anywhere else.

THE COURT:  Okay.  Do you have anything else?

MR. WALLACE:  The only other argument we have that I believe that hasn't been addressed is the motion to strike the class claims.

THE COURT:  Okay.  I'm not interested in hearing that now.  I don't think they've moved for class certification yet, have they?

MR. WALLACE:  They have not.  And I'm happy to reserve argument for that for the day.

THE COURT:  Yeah, I think I'd rather hear that if they decide to move for class certification.

MR. WALLACE:  Yes, sir.

THE COURT:  So why don't we hear from them now and have some time for rebuttal.

MS. LISS-RIORDAN:  Good morning, Your Honor. Shannon Liss-Riordan for plaintiffs.

So just by way of a little bit of background, which you may or may not know.  I don't know if this all went into your pleadings before you.  Our law firm is currently representing about 2,000 Twitter employees individually in arbitration on these exact same claims. And, in fact, the complaint here in the Cornet case is an exhibit to the 2,000 arbitration demands we've filed.  So it's the exact same claims.  We have, to date --

THE COURT:  Are you representing plaintiffs in any other district, actions in other districts I should know about?

MS. LISS-RIORDAN:  We're representing plaintiffs in more than a dozen class actions around the country, most in California.

THE COURT:  Okay.

MS. LISS-RIORDAN:  Including some cases in California that raise the same claims as this case.

THE COURT:  Okay.  And they're the same kind of class allegations?

MS. LISS-RIORDAN:  Yes.

THE COURT:  Have any of those other District Court judges gotten to a class certification decision yet?

MS. LISS-RIORDAN:  No.  No.  I believe we have a case that raises the same claims as this that has been stayed in California state court.  There's another California state court case --

THE COURT:  They're in state court.  I specifically wanted to know about other District Court cases.

MS. LISS-RIORDAN:  Right.  The other District Court cases that we filed are on a different topic, so they don't relate to the severance issue that's at issue here.

THE COURT:  And maybe, because you don't handle everything, but are you aware of other District Court cases besides the three that are pending here in Delaware about the severance pay?

MS. LISS-RIORDAN:  No.

THE COURT:  Okay.  So I don't have to worry about -- you know, I'm an appellate judge, I do some stuff here and I've been doing it a few years, but if you start to say MDL, I'm going to get really scared.  So we're not in that situation.

MS. LISS-RIORDAN:  No MDL here.  This case, as I'm sure you're aware, this is the first filed case.  It was originally filed November 3rd, 2022, the night that the

layoffs started and then the Arnold case we talked about was filed about six months later.

THE COURT:  Okay.

MS. LISS-RIORDAN:  But just to give you the lay of the land, our law firm is representing 2,000 employees in individual arbitrations.

THE COURT:  I've seen.  You've been filing arbitration awards.  I get it.  Can we jump into the issues, though?

MS. LISS-RIORDAN:  Yes.

THE COURT:  I found Judge Burke's opinion very instructive on this point.  I'm sure you're familiar with it.

MS. LISS-RIORDAN:  Yes.

THE COURT:  But I do see Twitter's argument that the factual allegations in your complaint are somewhat more conclusory and bare bones than in the Arnold complaint.

MS. LISS-RIORDAN:  Yes.  We did notice pleading and if I can just talk about the differences between this case and how we've argued it and what was argued in the Arnold case.  If you look at the Arnold decision, Judge Burke said, he made reference to -- he recognized that a no third party beneficiary clause is not necessarily dispositive.  But then he actually said, on this evidentiary record, and then he went ahead to make his conclusion.

There's no evidentiary record.  It was a complaint -- a motion to dismiss.  We argued, and the Arnold plaintiffs didn't really emphasize this in their opposition to motion to dismiss, that there's ambiguity here due to the conflicting provisions.  And we have argued, we have made -- because in Arnold the plaintiffs there went ahead and tried to argue, we win because of 6.9(a).  We're not raising that. We're just saying that because there are conflicting provisions, extrinsic evidence is necessary and a full evidentiary record.  And in fact, again, the arbitration decisions, we have 45 cases we've arbitrated.  We have decisions in 12.  In all 11 cases where the arbitrators addressed the third-party beneficiary issue, all 11 cases the arbitrators ruled for the employees and found that there was a breach of contract.  And in five of those 11 decisions --

THE COURT:  You mean a breach of the merger agreement or a breach of contract, because they're two separate things, right?

MS. LISS-RIORDAN:  Yes.  In five cases arbitrators held breach of the merger agreement and employees are third-party beneficiaries.

THE COURT:  Based on 6.9(a)?

MS. LISS-RIORDAN:  Yes.  And they found you have to read the contract wholistically, you have to harmonize

provisions, you can't read out a provision that would make it superfluous.  Twitter's arguments just before you a few moments ago, they couldn't speak to the intent of 6.9(a) as instructed.

THE COURT:  I understand that.  What is your view as to the clauses that very specifically say there's no third-party beneficiaries to this agreement?

MS. LISS-RIORDAN:  Well, as one arbitrator noted -- first of all, there needs to be someone who can enforce the provision.  Under Twitter's reading, it's superfluous because no one could enforce it.  One arbitrator read that to mean a deli -- a guy who owns a deli downstairs who is harmed by the fact that Twitter has laid off half of its workforce moves to enforce that provision because that harmed the employees and that harms his deli business.

THE COURT:  Okay.  That seems a little remote to me.  Let me ask you this --

MS. LISS-RIORDAN:  Yes.

THE COURT:  Does it really matter about the breach of merger agreement if you go forward on the promissory estoppel and the breach of contract?  Are there -- is there different relief you could gain under the different theories?

MS. LISS-RIORDAN:  I mean, here's the point.  Of these 11 decisions we have, a hundred percent of the

arbitrators ruled in our favor on this --

THE COURT:  Can I just stop you?

MS. LISS-RIORDAN:  Yes.

THE COURT:  I know you want to tell me about these arbitrator decisions.  They are not going to carry a huge amount of weight with me.

MS. LISS-RIORDAN:  I understand that.

THE COURT:  I understand you've submitted them. Just make you're arguments.

MS. LISS-RIORDAN:  My point also, as we noted, is that Twitter's argument is that no reasonable factfinder could find for the plaintiffs on the merger agreement argument.  And we have three arbitrators and five decisions who have.  So that undercuts that.  But my point is that -- I think Twitter's lawyer just said it opposite.  He said it backwards when he said that 6.9(a) is general and then the disclaimer is specific.  I think it's the other way around. I think the disclaimer is general and 6.9(a) is specific. So the no third-party beneficiaries, it could refer to others who are not specifically indicated to have an interest in this.  We have extrinsic evidence we've developed through discovery and all the arbitrations that we're doing, a full evidentiary record which shows the extrinsic evidence, which Delaware courts have recognized, can be used and should be looked at when there are

ambiguities and contradictory provisions of an agreement. And that extrinsic evidence has shown, for example, that there have been other indications of intent by the parties to benefit the employees.

THE COURT:  Okay.

MS. LISS-RIORDAN:  One of them is --

THE COURT:  I understand your arguments to this point.

MS. LISS-RIORDAN:  Yes.

THE COURT:  But can you answer my question?  Is there different remedies available under the breach of merger agreement as opposed to the promissory estoppel and the breach of contract claim?

MS. LISS-RIORDAN:  Yes.  Here is the reason the merger agreement claim is important.  Because this is a class action.  If we are correct, which we believe we are, that there was a breach of the merger agreement, that is much more easily resolved on a class-wide basis, that obviously promissory estoppel would involve individual reliance.  And the breach of contract, it's arguable whether there might be individual distinctions there.  But for the breach of the merger agreement, this case may be resolved must more readily through the class mechanism so we don't have -- we believe there are hundreds of potential class members in this case who are not bound by arbitration.

THE COURT: That's fair. I understand that. Can you move on to the breach of contract and promissory estoppel claims then and explain why your allegations, which I think are less detailed, with regard to 12(b)(6)?

MS. LISS-RIORDAN: Right. So we used notice pleading, which we think is sufficient. We spelled out what needs to be spelled out. If the Court has any questions, things we need to beef it up, we have a lot more facts now that we've gone through discovery, we'd be happy to beef it up. But we think what we said states the claim plainly and puts Twitter on notice of what our claims are. There were written and oral representations made to the employees in addition to the merger agreement from which the plaintiffs were promised that they would get the severance in the event of layoffs after Mr. Musk acquired the company. And the *Schobinger v. Twitter* case, which we cited, that's a different case in federal court in California where a court acknowledged our argument. It was a different theory. That's a case involving bonuses that employees who were not laid off alleged that they were promised and they didn't get and Twitter pointed to the bonus policy at Twitter, which specifically said it was discretionary. They said look, Judge, this bonus is discretionary, they can't sue under it, and the judge agreed with us and said, no, they are not suing under the original bonus policy, they're saying there

were separate oral and written representations made to them that they would get it after the acquisition, and he denied the motion to dismiss to let that go forward.  That's the same thing here regardless of what you think about the merger agreement.  We have alleged in the complaint that there were separate oral and written representations made about the severance promise.

And then I also want to address the issue of one of the plaintiffs here, Brett Folkins, who Twitter argues, well, he couldn't have been laid off because he didn't click a button saying yes in response to the so-called fork in the road email that Elon Musk sent out asking people to click yes if they agreed.  We have alleged in the complaint that Mr. Folkins was laid off, that all the employees who didn't click yes were notified the next day that their employment would end two months later and that they are part of the mass layoffs.  And, in fact, we developed evidence to that extent.

THE COURT:  I take it your view is that the failure to check the box doesn't indicate that you're voluntary resigning?

MS. LISS-RIORDAN:  Yes.  And we also have evidence and we've alleged it was part of the mass layoffs. We have a lot of evidence that Elon Musk used this email to further his layoffs.  He intended to layoff 80% of the

company and he ultimately did.  And, in fact, 1,109 employees did not click yes and were notified on November 18th that they would no longer be at the company after that. So it's a fact issue that can't be decided on a Rule 12(b)(6) motion whether or not Mr. Folkins was laid off or, in fact, voluntary resigned and therefore was not entitled to the severance promise.  And, in fact, we have evidence from Twitter showing that they called it a layoff, so that's something that will need to be developed during discovery and creation of an evidentiary record in this case.  We can't just say oh, he resigned.  That's not what our complaint states.  Our complaint states that he was part of the layoffs.

THE COURT:  Okay.  And the promissory estoppel argument, can you just address the specific arguments made here today that your plaintiffs didn't actually take any kind of positive change or forego any offers of employment that would lead to promissory estoppel?

MS. LISS-RIORDAN:  Yes.  So we have case law and I believe we've cited it.  We have even more than that now, but we've cited case law in our opposition that foregoing the freedom to leave an at-will position is taking an action.  So these plaintiffs relied to their detriment on these promises by not going and looking for another job when the job market was much more favorable for employees and

before the acquisition in 2022.

THE COURT:  So you don't think the precedent requires you to show that they actually turned down offers from other employment?

MS. LISS-RIORDAN:  No.  As again, I know you don't care about arbitrators, but some factfinders have already found --

THE COURT:  I didn't say I didn't care about them, I just understand that they have less weight with me than decisions from other district courts and other even state courts on these issues.

MS. LISS-RIORDAN:  Fully understood on the legal issues.  My point is that they have seen full evidentiary records and witnesses and testimony and exhibits, so they have not looked at these matters on a motion to dismiss, they've actually seen the evidence.

THE COURT:  Sure.  But you understand we're on a motion to dismiss, so I'm not going to use those arbitrator decisions to fill out a factual record that's not in the complaint.

MS. LISS-RIORDAN:  Understood.  All I'm saying is that based on the same complaint we filed in this case, because when we stated the claims in those arbitrations, we attached the complaint in this case as our factual allegations and then discovery and ultimate hearings on the

merits led to rulings in our favor.  So all I'm saying is that additionally bolsters that these are valid claims that should go forward to discovery and building of an evidentiary record and further pursued in this court.

THE COURT:  I'm going to ask you the same question I asked to Twitter.  Are you aware -- and I know we're still looking at the complaints, but are you aware of any kind of factual distinction in these plaintiffs' employment relationship with Twitter that would factually distinguish them if we get to discovery and things like that from the Arnold plaintiffs?

MS. LISS-RIORDAN:  No.  It's the same factual -- it's the same factual underpinning, just different ways that the claims have been stated and argued.

THE COURT:  Okay.

MS. LISS-RIORDAN:  And again, the Arnold plaintiffs argued essentially we win on the face of the complaint and the merger agreement itself.  And we're not saying that, we're just saying Twitter can't get judgment now based on our allegations which state a claim and because there are clear ambiguities and contradictions.  The case law says that extrinsic evidence needs to be looked at when there are such contradictions, so we're just simply asking for the motion to be denied and allow us to go forward to present the evidentiary record.

THE COURT: One final question. They've asked for the class certification part to be dismissed. Do you have any -- and I know you haven't moved for the class. Hypothetically if I denied the motion, do you have a plan or can you foresee when that, the timing of that motion is going to be filed?

MS. LISS-RIORDAN: We can file that right away. We have everything we need.

THE COURT: Okay. Do you have anything else?

MS. LISS-RIORDAN: Let's see. Twitter made the argument that Barrato and Kim, that we didn't plead what law would apply. We just have pled common law claims which we assert are breach of contract. The standard for breach of contract is consistent across states. That's something you can look at when we move for class certification. We have cases -- in fact, the Mayhew arbitration decision was decided under New York law and that arbitrator ruled in our favor on breach of the merger agreement, breach of contract and promissory estoppel. So there are not material differences among the states' laws on these common law issues, but that's something you can address later.

Let's see. I think that sums it up, unless Your Honor has any more questions for me.

THE COURT: No. Thank you.

MS. LISS-RIORDAN: Okay. Thank you very much.

MR. WALLACE:  Your Honor, briefly?

THE COURT:  Yeah.

MR. WALLACE:  Just on the arbitration issue. And I appreciate that Your Honor understands that there's a bunch of stuff being talked about and it's within the four corners of the document that controls and I just want to emphasize that and that's what we cabined our arguments around, that, irrespective of what's happened over two years since everything was filed.

But as to plaintiffs' counsel's continual incessant filing of these arbitration decisions, one, they're not helpful, as Your Honor noted, for purposes of the 12(b)(6) motion.  They're also improper because every time they're being submitted, they're being submitted with argument, which is in violation of the local rules.

THE COURT:  Have you moved to strike?

MR. WALLACE:  We filed a response.  We'll file more responses, but we'll --

THE COURT:  I'll sort it out.  Honestly, they have very little weight with me in terms of what I'm going to decide in this case.  So I guess if you keep filing them, you may force me to make a ruling on whether they're permissible or not.  I don't find them useful.  So maybe you should just stop filing them, but if you want to keep filing them, then they can move to strike them and I'll make a

decision on that.

MR. WALLACE:  I appreciate that, Your Honor. And one point I want to raise also, to have it on the record, is plaintiffs' counsel just mentioned one of the claimant's name in arbitration.  The arbitrations are confidential.  I think that was inappropriate.  I'm standing here to say I object, because I'm not waiving the confidentiality of the arbitration proceedings.  And that's another we have, obviously, the serial filing of these on a public docket.

THE COURT:  Well, I think they're all being filed under seal.

MR. WALLACE:  Do date, yes, Your Honor, but as you just heard, the seal is being lifted in open court.

THE COURT:  Well, okay.  There's probably --

MR. WALLACE:  I understand.  I'm just making the record.

THE COURT:  I don't need to deal with this back and forth on these kind of --

MR. WALLACE.  Understood, Your Honor.

THE COURT:  What I want you to address is their argument about the ambiguity of the merger agreement, about those two clauses.  And I know Judge Burke looked at it and found it not ambiguous, but there is some -- I wouldn't say weight, but there is something to the argument that if you

have one clause that says this and then even if you have a bunch of other clauses that say the same thing, how do we determine whether that raises a true ambiguity or that clause has some other purpose, because you didn't explain to me our opening argument whether you thought 6.9(a) was for if it wasn't for the benefit of these employees, you just relied on these other clauses.  And I understand those clauses are really clear, but what am I supposed to do when I have two clauses that tug up against each other?

MR. WALLACE:  Right.  I think Judge Burke got it correct in looking at what was specific as to what was the general, I think 6.9(a) is the general statement and 6.9(e) is the specific, so under that canon, 6.9(e) carries the day and to find otherwise would mean that every time there's a provision in the contract, any third party could pop up even if they're expressly disclaimed as a third-party beneficiary under that provision of the contract, to say I have some benefit here, which I think would be contrary to binding Delaware state court law.  I think it would open the flood gates to employees to interfere with merger agreements on a regular basis and would be problematic.

THE COURT:  Well, if you didn't put those clauses in, you wouldn't have any question about whether employees could benefit because there would be no clause there that was for the benefit of the employees, so I don't

know of the fear of that going forward it may be that clause shouldn't be in there. That's a decision for me. I don't need any more argument on it. I understand it.

I appreciated the candor from the other side that it helps for the class possibility. I'm not going to obviously decide the legal issue about whether it's a going to make a class easier or not, but can you answer for me, do you see any -- maybe I've asked you this and you've already answered it, but to make it clear in my mind, is there any difference in relief that you would get from a breach of the merger agreement with regards to the severance pay or if I didn't kick out the promissory estoppel or the breach of contract or are they basically all going after the same relief?

MR. WALLACE: I think depending the facts as they are developed, I think the merger agreement claim and the breach of contract claim are probably seeking the same thing. The promissory estoppel claim, I think we're missing each other or where the parties are missing each other, promissory estoppel is you're seeking reliance damages, again, which goes to what -- what did I forego.

THE COURT: Okay.

MR. WALLACE: Because I trust they're also going to seek lost wages down the line, because I could have gotten a job sooner, but I didn't and all these other things

that are different measures of damage than the expectation damages we get under the the contract.  So I think that's why the fact they pled they didn't do anything is dispositive here.

THE COURT:  Okay.  Do you have anything else?

MR. WALLACE:  Nothing further, Your Honor. Thank you.

THE COURT:  Okay.  Thanks.  I'll take this under advisement and I'll try to get a decision on it as soon as I can.

(Court adjourned at 12:45 p.m.)


---------------------------------


I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court